822 F.2d 1348
 26 ERC 1281, 56 USLW 2067, 17 Envtl.
L. Rep. 21,277
 The MARYLAND CASUALTY COMPANY, Plaintiff-Appellee,
v.
ARMCO, INC., Defendant-Appellant,
Lumbermens Mutual Casualty Company; AT & T Technologies,
Inc.; State of Missouri; Insurance Environmental
Litigation Association; Keith Rayment,
Amici Curiae.
 No. 86-3125.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 2, 1987.
Decided July 6, 1987.
Rehearing and Rehearing In Banc Denied Aug. 4, 1987.
 
 Benjamin Rosenberg (Craig E. Smith, James R. Moxley, III, Baltimore, Md., Marc R. Engel, Washington, D.C., W. Warren Hamel, Venable, Baetjer & Howard, Baltimore, Md., on brief), for defendant-appellant.
 Thomas William Brunner (Steven C. Kahn, Jeffrey F. Liss, Laura A. Foggan, John W. Cavilia, Piper & Marbury, Washington, D.C., on brief), for plaintiff-appellee.
 Robert N. Sayler, John E. Heintz, William F. Greaney, Frederick G. Herold, Covington & Burling, Washington, D.C., on brief, for amicus curiae AT & T Technologies, Inc., The Boeing Co., Carter Day Industries, Inc., Chemical Mfrs. Associations, Ex-Cell-O Corporations, Intern. Business Machines Corp., Key Pharmaceuticals, Inc., SCM Corp., Stauffer Chemical Co. and 3M Co., (Richard L. Blatt, Richard S. Borland, Ellen J. Kerschner, Robert W. Hammesfahr, Peterson, Ross, Schloerb & Seidel, Patrick M. Sweeney, Chicago, Ill., Beverley L. Crump, Douglas M. Palais, McSweeney, Burtch & Crump, Richmond, Va. on brief), for amicus curiae Keth Rayment.
 William L. Webster, Atty. Gen., Shelley A. Woods, Asst. Atty. Gen., Jefferson City, Mo., on brief, for amicus curiae State of Missouri.
 Timothy C. Russell, Thomas S. Schaufelberger, Drinker, Biddle & Reath, Washington, D.C. on brief, for amicus curiae Lumbermens Mut. Cas. Co.
 Roger E. Warin, Virginia L. White-Mahaffey, Helen D. Irvin, Michael J. Markoff, Steptoe & Johnson, Washington, D.C. on brief, for amicus curiae Ins. Environmental Litigation Assn.
 Before WIDENER, SPROUSE, and CHAPMAN, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 The appellee, The Maryland Casualty Company, sought a declaratory judgment concerning its liability to its insured, Armco, Inc., arising out of a suit brought against Armco by the United States. The underlying suit is a claim against Armco for reimbursement and injunctive relief because of an alleged endangerment to the environment at a hazardous waste site in Missouri. The question presented is whether the claim brought against Armco in Missouri constitutes a claim for "damages" as defined in the insurance agreement between Armco and Maryland Casualty. We hold that the claim seeking compliance with regulatory directives of a federal agency, which compliance takes the form of obedience to injunctions and reimbursement of remedial costs, does not constitute a claim for "damages" under the insurance policy. We affirm the decision of the district court that Maryland Casualty is not obligated to indemnify nor defend Armco in the Missouri litigation.
 
 
 2
 * At issue is a general comprehensive liability policy first negotiated between Maryland Casualty and Armco in 1966. Modified periodically, it remained in effect until June 1, 1983. Totaling one hundred and fifty-eight pages, the policy is "manuscript" in several instances: that is, some provisions are negotiated and specifically written for this insured. In pertinent part, the policy obligates Maryland Casualty:
 
 
 3
 [T]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by an occurrence; [and]
 
 
 4
 [To] defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false, or fraudulent....
 
 
 5
 In the Missouri litigation, United States v. Conservation Chemical Company, 653 F.Supp. 152 (W.D.Mo.1986) ("CCC "), the United States brought suit against both the owners of the waste storage facility and the "original waste generator" defendants, which latter group included Armco. The complaint alleged that improper maintenance techniques utilized in storing the hazardous waste resulted in the seepage of toxic chemicals into the soil and groundwater surrounding the site and surface flows off the site and onto adjoining property. The complaint also alleged that the chemicals have migrated from the site as leachate into the Missouri and Blue Rivers and thus pose a threat to persons living in communities downriver who use the rivers for crop irrigation, livestock and wildlife watering, boating, industrial water supply and as a source of drinking water.
 
 
 6
 The suit was brought pursuant to the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Secs. 6901-91, and the Comprehensive Environmental Response, Compensation and Liability Act of 1980, Pub.L. No. 96-510, 94 Stat. 2767 (1980) ("CERCLA"). Among its CERCLA claims the government sued under Sec. 106 and under Sec. 107, 42 U.S.C. Sec. 9607(a)(4)(A) seeking to compel the responsible parties to implement a comprehensive remedial action program and seeking reimbursement for all of its investigatory and other response costs and enforcement activities related to the site and for the costs incurred or to be incurred in cleaning up the affected area.
 
 
 7
 CERCLA Sec. 107, 42 U.S.C. Sec. 9607 reads in pertinent part:
 
 
 8
 (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for--
 
 
 9
 (A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;
 
 
 10
 (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and
 
 
 11
 (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.[1]
 
 
 12
 In January 1986, the original waste generator defendants in the CCC litigation, including Armco, filed an amended third-party complaint against the site operator defendants' primary and excess insurers, including Maryland Casualty, alleging that the third-party plaintiffs were intended and/or creditor beneficiaries of the site operator defendants' insurance policies. The complaint asserted that the insurers were obligated to indemnify the original waste generator defendants against all damages, costs and fees which they had incurred or would incur. The insurance policy between Maryland Casualty and the CCC operator defendants contained nearly identical language to the Maryland Casualty--Armco policy at issue in this case.
 
 
 13
 The special master appointed in CCC found that Maryland Casualty was under an obligation to indemnify and defend Armco in the CCC litigation. Specifically, the master determined that environmental harm constitutes "property damage" as defined in the insurance policy, and that environmental response costs constitute "damages" as contained in the policy. The district judge in CCC signed an order which adopted, in substantial part, the recommendations of the special master. Immediately thereafter, Maryland Casualty and two other insurers informed the judge that they wished to complete a settlement with the original generator defendants, including Armco. The district judge stated that he would set aside his order nunc pro tunc as to any settling insurers. The settlement was reached, and the order was vacated.
 
 
 14
 The district court in the present litigation found that the action taken by the Missouri district court did not render the present controversy res judicata, and did not give rise to collateral estoppel. Addressing the case on the merits, the court held that Armco was not entitled to defense costs and indemnity from Maryland Casualty in the CCC litigation. Maryland Casualty Company v. Armco, Inc., 643 F.Supp. 430 (D.Md.1986). The court stated that "[b]lack letter insurance law holds that claims for equitable relief are not claims for 'damages' under liability insurance contracts." Id. at 432. The district court then inquired into whether CCC involved a claim for equitable relief. The court considered whether the nature of that claim was a "legal" or "equitable" claim as historically defined, and analogized to judicial interpretations of the Seventh Amendment right to a jury trial. Because "[e]very court that has considered the question has held that CERCLA response cost suits fall on the equity side of the line," id. at 435, the CCC claim was not a legal claim, and therefore was not a suit for damages against which Maryland Casualty must defend and indemnify.
 
 II
 
 15
 Maryland Casualty's obligations under the terms of the insurance agreement arise only where the insured has become "legally obligated to pay as damages because of injury to or destruction of property...." It is black-letter law that the terms of an insurance policy are to be construed according to the meaning a reasonably prudent layman would infer. Pacific Indemnity Company v. Interstate Fire & Casualty Company, 302 Md. 383, 488 A.2d 486, 488 (1985). Under this standard, Armco and its amici AT & T, et al., argue that the term "damages" connotes virtually any claim for monetary relief.
 
 
 16
 Judicial decisions, although not rejecting the rule of construction that terms of an insurance contract are to be given their ordinary meaning, have nevertheless limited the breadth of the definition of "damages" somewhat more narrowly than the appellant suggests. "Damages," as distinguished from claims for injunctive or restitutionary relief, includes "only payments to third persons when those persons have a legal claim for damages...." Aetna Casualty and Surety Company v. Hanna, 224 F.2d 499, 503 (5th Cir.1955). See also, Desrochers v. New York Casualty Company, 99 N.H. 129, 106 A.2d 196 (1954). Thus "damages" is to be construed in consonance with its "accepted technical meaning in law." Hanna, 224 F.2d at 503. Maryland law, which governs the construction of this agreement, has similarly adopted the somewhat narrow, technical definition of damages. See, e.g., Haines v. St. Paul Fire and Marine Insurance Company, 428 F.Supp. 435 (D.Md.1977) (holding that a claim for restitution of illgotten profits was an action for "traditional equitable relief and cannot be considered damages within the policy coverage").
 
 
 17
 The best approach in construing the term "damages" as contained in this insurance contract is to afford it the legal, technical meaning described in Hanna. The contract obligates Maryland Casualty to pay where its insured becomes obligated "to pay as damages...." If the term "damages" is given the broad, boundless connotations sought by the appellant, then the term "damages" in the contract between Maryland Casualty and Armco would become mere surplusage, because any obligation to pay would be covered. The limitation implied by employment of the phrase "to pay as damages" would be obliterated. We thus proceed to examine whether the claim for relief in the CCC litigation involves a claim for "damages" properly defined, or whether it asserts claims for equitable relief.
 
 
 18
 In the CCC litigation, the government sought both injunctive relief and restitution in the form of reimbursement of costs, including engineering and clean-up costs, in connection with the allegedly hazardous waste contamination in Missouri. The claim for the reimbursement element arises under CERCLA Sec. 107(a), and it is clear that the form of relief requested in CCC pursuant to CERCLA Sec. 107(a) is not "damages" in the legal sense, but rather is a form of equitable, remedial relief. Because we adopt the construction of the term "damages" as employed by the court in Hanna and the other cases cited, we find the claims raised in CCC are not within the coverage of the insurance contract. The general comprehensive liability policy between the parties covers "damages," but not the expenditures which result from complying with the directives of regulatory agencies.
 
 
 19
 Armco and its amici proffer the creative argument that an action for restitution which arises from the fulfillment of one's legal obligation by another is an action in quasi-contract, and therefore is an action at law, and not in equity. This argument, however, misperceives the focus of the inquiry. In defining "damages," and distinguishing "damages" from equitable remedies, we focus not on the nature of the underlying action, but rather on the form of relief sought. In other words, whether a particular cause of action has historically been considered a "legal" or "equitable" proceeding, with the differing procedural and substantive rights thereto appertaining, is irrelevant. The insurance contract, which controls the obligations between the parties and therefore centers the focus of this court, is written in terms of the relief sought, and not in terms of the form of the cause of action. The contract describes "damages" to be paid, and not liabilities arising out of "legal," rather than "equitable" proceedings.
 
 
 20
 The appellant relies upon two decisions that have held that a claim for apparent equitable relief for reimbursement of environmental cleanup expenses is a claim for "damages" as used in the standard general comprehensive liability policy. We find these decisions unpersuasive. In United States Aviex Company v. Travelers Insurance Company, 125 Mich.App. 579, 336 N.W.2d 838 (1983), the court held that the term "damages" included monies recovered to reimburse the government for costs incurred in investigating and correcting chemical contamination of percolating waters. In rejecting the argument that the term "damages" should be limited to compensation for injury or loss, as distinguished from costs incurred in complying with equitable or injunctive orders, the court noted that other jurisdictions had recognized this distinction, citing Hanna among other decisions. Rejecting the definition employed in other jurisdictions as being too narrow, the court in Aviex reasoned that the "merely fortuitous" event that the state has chosen to clean the contamination itself and then sue for reimbursement, rather than suing straightforwardly for damages, should not excuse the insurer from liability on its policy. According to the Aviex court the measure of damages to natural resources is measured simply as the costs of restoration, and whether a plaintiff sues for the damages or the costs should not determine the coverage under the insurance policy.
 
 
 21
 We think this reasoning is faulty for two reasons. First, it is not necessarily correct that the measure of relief is unrelated to whether the government sues for reimbursement or for damages. Damages is a form of substitutional redress which seeks to replace the loss in value with a sum of money. Restitution, conversely, is designed to reimburse a party for restoring the status quo. It might very well cost far more to restore a contaminated marsh than it would to pay damages for its loss. See, e.g., Peevyhouse v. Garland Coal & Mining Co., 382 P.2d 109 (Okla.1962), cert. denied, 375 U.S. 906, 84 S.Ct. 196, 11 L.Ed.2d 145 (1963) (where the cost of restoring strip-mined land was more than quadruple its potential value in the restored condition).
 
 
 22
 Second, even assuming that the costs to the defendant are the same regardless of whether the government sues for restitution or for damages, thus in some sense rendering the decision by the government regarding whether to sue for damages or restitution a "mere fortuity," it is a great step, and a dangerous one, for courts to begin to construe insurance policies to encompass costs of compliance with injunctive and reimbursement relief.
 
 
 23
 Insurance policies, probably for reasons of certainty and economy, traditionally reimburse only damages arising from actual, tangible injury. Insurers are very reluctant to cover what are essentially prophylactic measures, such as safety precautions, for the obvious reason that such expenditures are subject to the discretion of the insured, and are not connected with any harm to specific third parties. Insurers require certainty as to the extent of their liability and this certainty is set forth in the insurance policy, which in the instant case was a negotiated manuscript policy. The less obvious, but perhaps more telling reason that insurers are reluctant to cover avoidance costs is that insureds are far more likely to overutilize safety measures where another party is paying the bill. Should policies be construed to cover some forms of harm-avoidance measures, courts would be faced with the very difficult problem of separating needed prophylactic measures from unnecessary or inefficient ones.
 
 
 24
 From an insurer's perspective, investigative and remedial action taken by the government respecting potential environmental hazards constitutes a prophylactic measure. In the CCC litigation which underlies this case, the government, choosing not to wait and learn whether the environmental spill in Missouri created a hazard which would cause harm to the wildlife and humans in the Missouri River and Blue River region, has intervened immediately upon learning of the toxic contamination. The case thus presents no instance of harm to human or animal life, but merely the prevention of such harm. Even if some such harm had occurred, the fundamental nature of the government's intervention is the same: the government seeks to prevent or mitigate the occurrences or reoccurrences of hazardous contamination. This action is fundamentally prophylactic, and is not of the sort that Maryland Casualty contracted to cover.
 
 
 25
 Armco also relies upon the recent decision in Continental Insurance Companies v. Northeastern Pharmaceutical and Chemical, Inc., 811 F.2d 1180 (8th Cir. 1985), rehearing en banc granted 815 F.2d 51 (8th Cir. 1987). (NEPACCO). In a 2-1 decision, the court held that damage to the environment constitutes "property damage" as contained in that insurance policy.[2] The court, however, in an apparently advisory spirit, continued beyond its holding to address the issue of whether the term "damages" as used in the standard general comprehensive liability policy includes claims for reimbursement and other equitable relief. The court held that "damages" does include claims for equitable relief, reasoning that the measure of damages is the same regardless of whether the suit seeks damages or reimbursement. Thus this decision rests on the same logic we find faulty in Aviex.
 
 
 26
 Maryland Casualty has contracted with Armco to reimburse only where Armco is obligated to pay damages which result from injury, which in the insurance context means damages in the legal sense. In the absence of clear contract language or specific Congressional authorization in CERCLA, we decline to extend the obligations of insurance carriers beyond the well-illumined area of tangible injury and into the murky and boundless realm of injury prevention. We hold that the costs to Armco of complying with the directives of a regulatory agency are not covered within the terms of the insurance policy.
 
 III
 
 27
 Armco has argued that the duty to defend is broader than Maryland Casualty's obligation to reimburse Armco for damages and that the district court erred in construing the terms in pari materia, with the effect of holding that Maryland Casualty had no duty to defend Armco in the CCC litigation. Under Maryland law, the insurer has a duty to defend where there is a "possibility" that it may be liable. Continental Casualty Company v. Board of Education of Charles County, 302 Md. 516, 489 A.2d 536 (1985). The insurance contract provides that Maryland Casualty will defend any suit against Armco which alleges "such injury, ... even if such suit is groundless, false, or fraudulent...." Thus, the duty to defend arises only where there is an allegation of "such injury," which phrase refers to the liability of the insurance company to pay on behalf of Armco the sums which Armco will become legally obligated "to pay as damages because of injury to or destruction of property...." It is clear that the duty to defend and the duty to reimburse are to be interpreted coterminously, and because we hold that the claim in the CCC litigation does not allege a claim for damages as defined in the policy, then a mere "possibility" of liability on behalf of Maryland Casualty does not arise.
 
 IV
 
 28
 The appellant has offered two other theories. First, the appellant argues that response costs are "mitigation" costs which, because their incursion saves the insurer money for which it would otherwise be liable, are "damages" under the terms of the policy. The appellant cites two cases which it says supports the recoverability of mitigation expenses. See Consolidated Rail Corporation v. Certain Underwriters at Lloyds, No. 84-2069, slip opinion (E.D.Pa. June 3, 1986) [Available on WESTLAW, DCT database]; Bankers Trust Company v. Hartford Accident and Indemnity Company, 518 F.Supp. 371 (S.D.N.Y.), vacated due to settlement, 621 F.Supp. 685 (S.D.N.Y.1981). In these cases, however, the court determined that the insurance contract specifically obligated the insurer to reimburse expenses undertaken to mitigate the amount of damages. The appellant has presented no argument that the Maryland Casualty policy by its terms implies the coverage of such damages. The appellant does argue, as a matter of judicial policy, that the insurer ought to be liable where the insured takes steps to mitigate the damages which would be chargeable to the insurer. Such an interpretation would suffer from the same difficulties attendant in construing Maryland Casualty liable for Armco's (or the government's) employment of prophylactic measures: the insurer would be uncertain of the extent of its liability in the absence of a requirement for an injury, the insured would have the tendency to over-utilize the "free" resource, and the judicial system would be faced with the impossible task of attempting to define the limitations on the necessity for the costs incurred in preventing future harm. We find this argument unpersuasive.
 
 
 29
 Second, the appellant argues that the action of the district court in Missouri, which assigned a special master to address the same issue but later vacated nunc pro tunc its order that adopted the master's recommendations, should have collateral estoppel or preferably res judicata effect in this case. The appellant argues that a defendant should not be able to manipulate the judicial system by entering into last-minute settlements in order to avoid the collateral estoppel effects of unfavorable judgments. See, Note, Collateral Estoppel of Nonparties, 87 Harv.L.Rev. 1485, 1503 (1974). Regarding the rule that the judgment in the prior suit must be "final" before collateral estoppel can obtain, the appellant cites Chemetron Corporation v. Business Funds, Inc., 682 F.2d 1149, 1191 (5th Cir.1982), vacated on other grounds, 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476 (1983) (stating that the finality requirement "does not require a judgment 'which ends the litigation ... and leaves nothing for the court to do but execute the judgment,' Catlin v. U.S., 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 ... (1945), but includes many dispositions which, though not final in that sense, have nevertheless been fully litigated").
 
 
 30
 We decline to hold that the recommendations of a special master, which have been vacated, rise to the level of a "final judgment" in order to estop the present litigation. In light of the significance of the issue presented and the large sums of money involved, and the fact that the manuscript policy was not before the Missouri court, the preclusion against the putative defendant of re-litigation on the grounds of estoppel arising out of withdrawn judgment is singularly inappropriate. See Note, Avoiding Issue Preclusion by Settlement Conditioned upon the Vacatur of Entered Judgments, 96 Yale L.J. 860 (1987). Collateral estoppel is an equitable doctrine, and we affirm the district court's decision on the equities not to employ it.
 
 Thus the decision of the district court is
 
 31
 AFFIRMED.
 
 
 
 [1]
 Section 9607 was slightly amended by Pub.L. 99-499, effective October 17, 1986, but this amendment has no bearing on this litigation
 
 
 [2]
 This holding is in disagreement with this court's holding in Mraz v. Canadian Universal Insurance Company, 804 F.2d 1325 (4th Cir.1986). The parties in this case do not raise the same issue as that presented in Mraz, and we therefore decline to base our decision on its holding