## The POTOMAC ELECTRIC POWER COMPANY, Plaintiff,

v.

## CALIFORNIA UNION INSURANCE CO., et al., Defendants.

Civ. A. No. 88–2091.

United States District Court, D. Columbia.

Sept. 30, 1991.

---

Arnold M. Weiner, Steven A. Allen, Bruce L. Mann, Hazel & Thomas, Baltimore, Md., for plaintiff.

Dennis M. Flannery, James Robertson, John R. Read, Wilmer, Cutler & Pickering, Washington, D.C., for defendant California Union Ins.

Thomas S. Schaufelberger, Scott P. Boylan, Drinker, Biddle & Reath, Washington, D.C., for defendant Empl. Ins. of Wausau.

Ignatius J. Melito, Stephen V. Kovarik, Siff, Rosen & Parker, P.C., New York City, for defendant First State Ins.

Barry R. Poretz, Laura E. Nachowitz, Jordan, Coyne, Savits & Lopata, Washington, D.C., for defendant Nat. Union Fire.

Joseph S. Crociata, Gilberg & Kurent, Washington, D.C., David Morgans, Williams & Montgomery, Chicago, Ill., for defendant Southern American Ins.

Michael Nussbaum, Jeffrey D. Robinson, Nussbaum & Wald, Washington, D.C., Thomas J. Quinn, Mary Ann D'Amato, John Spadaro, Mendes & Mount, New York City, for defendants London Market Insurers, North River Ins. Co. and American Centennial Ins. Co.

Lewis R. Christ (Receiver), Director of Ins., State of Mo., Jefferson City, Mo., Howard M. Berg, Berg, Tishe & Cottrell, P.A., Wilmington, Del., for defendant Transit Cas. Co.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

### I. Introduction

This case presents the Court with an overriding issue: are insurance companies

required to indemnify policyholders for expenditures made by them to remedy environmental damage caused by a third party?

The plaintiff, a large electric utility which primarily serves the District of Columbia and parts of Maryland, purchased twenty-one excess comprehensive general liability ("CGL") policies from the nine insurance companies which are the defendants in this case.[1] This lawsuit arises from the defendants' refusal to indemnify The Potomac Electric Power Company ("Pepco") for approximately $3.25 million Pepco spent to remedy environmental damage caused in the dismantling of obsolete electrical transformers it had sold as scrap metal to United Rigging and Hauling, Inc. ("United Rigging").

Suit was filed on July 28, 1988 and, following extensive discovery, a barrage of summary judgment motions have been filed by the parties. This opinion will address the following five motions: 1) Plaintiff's Motion for Partial Summary Judgment concerning whether plaintiff's expenditures to clean up the United Rigging site are covered by the CGL policies; 2) Defendants' Joint Motion for Summary Judgment as to Environmental Response Costs; 3) Certain Defendants' Motion for Summary Judgment as to Environmental Response Costs; 4) Defendants' Joint Motion for Summary Judgment as to the Pollution Exclusion; and 5) California Union's Motion for Summary Judgment Based on the "Seepage and Pollution" Clauses That Do Not Include the Word "Sudden." Other remaining motions will be addressed in a future opinion and order.

## II. Factual Background

Between 1980 and 1983, Pepco sold a large quantity of used electrical equipment to United Rigging. Specifically, during this time Pepco sold United Rigging approximately 2,200 used electrical transformers.[2] Prior to selling the transformers for scrap metal, Pepco was expected to drain the transformers of excess mineral oil and dispose of this oil, because the oil contained dangerous chemicals known as polychlorinated biphenyls ("PCBs").[3] United Rigging, using its own equipment, would pick up the transformers from Pepco's Benning Road location in the District of Columbia, and transport them to its salvage yard in Beltsville, Maryland. The transformers contained some residual oil contaminated with PCBs, and this residual oil eventually spilled into the environment at United Rigging's Beltsville site.[4] There were different causes of this spillage; part of it was caused by United Rigging in dismantling the transformers, which resulted in residual oil spilling onto the ground. United Rigging employees also collected some of this oil, and poured it over large areas of the ground to suppress dust. These activities seem to have occurred on a fairly regular basis over a period of years.[5]

In the spring of 1985, the United States Environmental Protection Agency ("EPA") and environmental officials from the State of Maryland, after the discovery of PCBs in a stream adjacent to United Rigging, began to investigate United Rigging's Beltsville site for PCB contamination. It

1. The eight defendants participating in these motions are California Union Insurance Company ("Cal Union"), North River Insurance Company ("North River"), London Market Insurers ("London Defendants"), Wausau Insurance Company ("Wausau"), American Centennial Insurance Company ("American Centennial"), Southern American Insurance Company ("Southern American"), First State Insurance Company ("First State"), and National Union Fire Insurance Company ("National Union"). The ninth defendant, Transit Casualty Co. is in receivership.

2. Plaintiff also sold transformers for scrap to fourteen other companies located in nine different states.

3. This procedure was required by regulations promulgated by the Environmental Protection Agency. Apparently, some unknown number of transformers were not properly drained before being sold to United Rigging.

4. Pepco claims it warned United Rigging of the presence of the PCB-contaminated residual oil in the transformers.

5. For the purpose of these summary judgment motions, United Rigging's culpability is immaterial, so there is no need to determine whether the mineral oil was intentionally dumped or negligently spilled.

was discovered on testing that the soil in some areas was contaminated to a depth of six feet. Eventually, they closed the site. In July of 1985, Pepco and United Rigging entered into a consent agreement with the Maryland officials and with EPA, under which Pepco and United Rigging agreed to clean up the United Rigging property. Under this plan, the soil which was contaminated with PCBs was to be removed from the site, transported, and properly disposed of. Pepco was to pay for this cleanup, and United Rigging was to supply the heavy equipment and operators for use in the removal of the polluted soil.[6]

In December 1985, the cleanup was substantially completed at a cost of approximately $3.25 million to Pepco, and $400,000 to United Rigging.

In October 1985, before the cleanup was completed, United Rigging and its owner, Charles E. Sloan, sued Pepco in the United States District Court for the District of Columbia, seeking damages for losses incurred by United Rigging as a result of its purchase of Pepco transformers. The case was dismissed for one year, while the parties attempted to settle. In November 1986, United Rigging and Sloan filed a second suit for the same injuries and damages and two additional causes of action. Pepco counterclaimed for damages, and part of its counterclaim was based on the $3.25 million it spent in cleaning up the Beltsville site. On August 17, 1987, Pepco settled with United Rigging and Sloan. Under the terms of this agreement, Pepco agreed to pay United Rigging $850,000 and to dismiss its counterclaim.

## III. Insurance Coverage

The excess liability insurance policies at issue in this case cover the years 1980 to 1985. Under these policies, Pepco is self-insured for the first million dollars in liability; these policies cover amounts in excess of the self-insured limit. The specific policies that are involved are described in Appendix One attached.

Each one of the policies contains a liability clause that indemnifies the insured for "damages" arising from the destruction of property. This clause is the subject of the first set of motions we will address in this opinion.

## IV. Choice of Law

■ A choice of law determination is of fundamental importance in a case such as this where there is a division of authority on certain dispositive issues. Since this case is before the Court as a result of diversity jurisdiction, we must apply the law of the District of Columbia to determine the applicable law. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Eli Lilly & Co. v. Home Insurance Co.*, 764 F.2d 876, 882 (D.C.Cir.1985), *cert. denied*, 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987). It seems to be undisputed that the law to be applied is either that of the District of Columbia or of Maryland.

Plaintiff contends that the law of the District of Columbia should apply to this case, since the District is the headquarters and principal place of business of Pepco.[7] Defendants urge us to apply Maryland law, Maryland being the site of pollution contamination and also the largest source of revenue of any of the three jurisdictions in which plaintiff operates.[8]

---

**6.** Shortly after the environmental authorities commenced their investigation in the spring of 1985, the Maryland officials through the Hazardous Waste Strike Force of the Office of the Maryland Attorney General began a grand jury investigation into the PCB contamination at United Rigging's Beltsville site. In the summer of 1986, United Rigging was charged with one count of water pollution, to which it pleaded guilty and paid a fine of $75,000. The federal government also conducted a grand jury investigation into this matter, but terminated the investigation without bringing any charges. No civil fine or penalty was ever imposed upon Pepco, nor was it the subject of any criminal charges.

**7.** Pepco's by-laws expressly provide that the corporation's principal place of business shall always be the District of Columbia. Plaintiff's Rule 108(h) Counterstatement, ¶ 214.

**8.** According to the 1985 10–K Form Pepco filed with the SEC, Pepco provides retail service to the District of Columbia, major portions of

■ Our first determination concerns whether a conflict of laws in fact exists. *Eli Lilly & Co.*, 764 F.2d at 882 (citing *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C.1970)); *Gaither v. Myers*, 404 F.2d 216, 222 (D.C.Cir.1968)). If Maryland law were to govern this action, we would be required to decide whether a decision favorable to defendants, *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir.1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988) ("*Armco*"), is binding on this Court. *Armco* is the Fourth Circuit's interpretation of Maryland law on one critical issue in this case: whether environmental response costs are covered in a Comprehensive General Liability ("CGL") policy. Since there is no District of Columbia law directly on point, there is therefore a potential or actual conflict between Maryland law and the law of the District of Columbia. *See Carey Canada, Inc. v. Aetna Casualty & Sur. Co.*, No. 84–3113, 1988 WL 169287 (D.D.C. Mar. 31, 1988) (Pratt, J.) (when the law of one jurisdiction is clear and the other is uncertain, a conflict exists). Given this conflict, it is necessary to make a choice of the law which is applicable.

To decide whether Maryland or District of Columbia law should apply, we turn to conventional criteria which includes a determination as to which jurisdiction has the "more substantial interest" in the resolution of this controversy. *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C.1970); *Blair v. Prudential Insurance Co. of America*, 472 F.2d 1356, 1359 (D.C.Cir.1972). Maryland claims that it has an interest in the case because Maryland is where the pollution occurred. Maryland is also the site of the largest portion of plaintiff's revenues. However, plaintiff points out that it sold transformers as scrap to fourteen other companies located in nine different states. Therefore, although the damage in this case in fact occurred in Maryland, it is equally possible the environmental damage could have also occurred in these other states. Defendants have not established any causal connection between plaintiff's business as an electric utility serving customers in Maryland and the damage caused in Maryland by the transformers sold as scrap to United Rigging. Thus we consider it fortuitous that Maryland was the state where Pepco's used and obsolete transformers caused environmental damage.

A holding that the location of the environmental damage dictates the choice of law would lead to anomalous results. Given the strict liability imposed on companies for, *inter alia*,[9] the sale of toxic waste, such a rule could result in a single insurance contract being interpreted in a multitude of different ways, depending on the law of the jurisdiction where environmental damage occurred.[10]

---

Montgomery and Prince George's Counties in Maryland and a small portion of Arlington County, Virginia. Pepco also provides wholesale electricity to four counties in southern Maryland. In 1985, Pepco derived 54% of its revenues from Maryland, and 44% from the District. Appendix to Plaintiff's Rule 108(h) Counterstatement, Exhibit 151.

Most of the insurers have their headquarters in various cities of the United States; some of them are even located in England. The majority of the insurance contracts were negotiated for plaintiff by an independent insurance broker in New York. Other policies were negotiated in Chicago and London. Given the great diversity of the residences of the insurers, and the lack of any central negotiating point, it is understandable that the parties have not asked us to consider these other locations as possible sources for the governing law in this case.

**9.** *See* 42 U.S.C. §§ 9601–9657 (provisions of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERC-

LA"), including the definition of "potentially responsible party"). Under CERCLA, those who dispose of toxic waste which is later found to pollute, are strictly liable for the cleanup of this pollution, regardless of the degree of care they exercised in disposing of the materials.

**10.** The case for applying Maryland law would have been stronger had it concerned plaintiff's liability for the PCB contamination. In such a litigation, Maryland would obviously have a strong interest, since it would be the jurisdiction that would be most affected if a cleanup was not properly accomplished. However, these matters are now fully satisfied; the Maryland site has been cleaned up by plaintiff and United Rigging has been made whole by plaintiff. In sum, it is difficult to see how Maryland has a continuing interest in this litigation, which solely concerns the plaintiff and its insurance companies. *Cf. W.R. Grace & Co. v. Continental Casualty Co.*, 896 F.2d 865, 874 (5th Cir.1990) (after plaintiff, headquartered in New York, set-

The irrationality of such an approach was recently recognized in *CPC Int'l, Inc. v. Northbrook Excess & Surplus Insurance Co.*, 739 F.Supp. 710 (D.R.I.1990). In *CPC Int'l*, plaintiff was headquartered in New Jersey, and had manufacturing operations in seven states. *Id.* at 711. The case was a declaratory judgment action whereby plaintiff sought to recover from its insurance company monies which a subsidiary of CPC had paid to environmental authorities as a result of pollution which had occurred in Rhode Island. The court declined to apply a "place of pollution" approach, stating "[u]sing a place of pollution approach will prove impractical in any case where the insurance policy in question provides for national or world-wide coverage." *Id.* at 713–14. The court found support in an earlier case which stated:

> the notion that the insured's rights under a single policy vary from state to state depending on the state in which the claim invoking the coverage arose contradicts not only the reasonable expectations of the parties but also the common understanding of the commercial community. It also seems to us anomalous, in conflict-of-law terms, to suggest that more than one body of law will apply to a single contract.

*Id.* at 714 (quoting *Westinghouse Electric Corp. v. Liberty Mutual Insurance Co.*, 559 A.2d 435, 442 (N.J.Super.Ct.1989)). *Accord Triangle Publications, Inc. v. Liberty Mutual Insurance Co.*, 703 F.Supp. 367 (E.D.Pa.1989) (company headquartered in Pennsylvania, environmental damage occurred in New Jersey, court applied law of Pennsylvania.) *But see Chesapeake Utilities Corp. v. American Home Assurance Co.*, 704 F.Supp. 551 (D.Del.1989) (court applied Maryland law to pollution in Maryland, and Delaware law to pollution in Delaware).

■ We think the most reasonable course is to choose the headquarters of the insured as the location with the most substantial interest in the controversy. This is especially true in a case such as this where the headquarters of the insured is also the center of the insured's operations. *See Carey Canada, Inc. v. Aetna Casualty & Sur. Co.*, No. 84–3113, 1988 WL 169287 (D.D.C. March 31, 1988); *Stevens v. American Service Mutual Ins. Co.*, 234 A.2d 305, 309 (D.C.1967).

Another reason for choosing the headquarters of the insured as the source of law is that this is the location which appears to be most likely contemplated by the parties:

> [C]ommon sense suggests that, knowing of the potential for claims in any number of states ... the parties would consider the insured's principal headquarters as the one jurisdiction which ties all potential parties together.

*CPC Int'l*, 739 F.Supp. at 715. This view is consistent with that of the Restatement (Second) of Conflict of Laws which states that for a liability insurance contract

> the local law of state which the parties understood was to be the principal location of the insured risk during the term of the policy [will be the source of law for the policy] unless with respect to the particular issue, some other state has a more significant relationship.

Restatement (Second) of Conflict of Laws § 193 (1971). *Accord Independent Petrochemical Corp. v. Aetna Cas. and Sur. Co.*, Civ. No. 83–3347, 1988 WL 242659 (D.D.C. Sept. 7, 1988) (1988 U.S.Dist. Lexis No. 15839) at 9, *rev'd*, 944 F.2d 940 (D.C.Cir.1991).

Plaintiff has proffered sufficient evidence to prove that, if any one location was contemplated as the source of law for these policies, it was the District. The District of Columbia is where Pepco is headquartered, and it is also the center of its operations. The insurance policies in question listed Pepco's District of Columbia address as the location of the insured. For all of the foregoing reasons, we hold that the law of

---

tled tort dispute which occurred in Texas, Texas no longer had a significant interest in the case,

therefore New York law was applied).

the District of Columbia will be applied to the issues in this case.[11]

## V. The Coverage of the Excess Policies at Issue

### 1. Plaintiff's Motion for Partial Summary Judgment to Recover Environmental Response Costs

We turn now to address the substantive issues raised in these motions. Plaintiff (and defendants) request summary judgment on the core issue of whether environmental response costs are covered by the liability policies issued by defendants. The term "environmental response costs" in this case refers to Pepco's expenditures for the cleanup and restoration of the United Rigging site, which Pepco undertook after entering into a consent order with the EPA and the State of Maryland. Pepco alleges it spent approximately $3.25 million dollars to clean up the United Rigging site, making these costs the largest single item for which Pepco seeks indemnity in this action.[12] Whether expenditures made by insureds in response to legal actions taken by environmental authorities are covered by CGL policies is not an easy issue to decide, and in fact is an issue which has divided courts around the country.

The liability clauses of the insurance policies at issue in this case are all essentially identical. A representative sample reads:

> This policy is to indemnify the Named Insured ... for any and all sums which the Insured shall become *legally* liable to pay, and shall pay, or by final judgment be adjudged to pay or assumed by the Insured under contract or agreement, *as damages* arising from personal injury and Advertising Injury or by reason of damage to or destruction of property,

including loss of use thereof (other than property owned by the Insured) resulting from any activity, trade or business of the Insured....[13] (Emphasis supplied.)

Some courts have held that this type of liability clause, which makes specific reference to "damages," does not cover environmental response costs because these costs are the result of regulatory actions by the government. These courts have reasoned that regulatory actions represent equitable, not legal remedies, and that the relief stemming therefrom is not "damages" in the common sense meaning of the term.[14]

Whether environmental response costs are "damages" has not yet been addressed by District of Columbia courts. Therefore, it is necessary to apply the general principles of insurance contract interpretation existing under District of Columbia law, and to look for guidance in cases from other jurisdictions which apply similar principles of interpretation.

In the District of Columbia, the terms of an insurance agreement are to be given "the meaning which common speech imports." *Belland v. American Automobile Ins. Co.*, 101 A.2d 517, 518 (D.C.1953); *Old American Ins. Co. v. Tucker*, 223 A.2d 334, 336 (D.C.1966). This rule is to be followed unless it is obvious that the term is intended to have a technical connotation. *Oler v. Liberty Mutual Ins. Co.*, 297 A.2d 333, 335 (D.C.1972); *Great American Indem. Co. v. Yoder*, 131 A.2d 401, 403 (D.C.1957). The rule protects insureds against legalistic interpretations of insurance contracts. As one District of Columbia court has stated, "public policy dictates against permitting insurance companies to engage in 'obscurantism which conveys one meaning of their contracts to lawyers and

---

**11.** Our Circuit has similarly held that the headquarters of the insured should be the source of law in products liability actions. *See Eli Lilly & Co. v. Home Insurance Co.*, 764 F.2d at 882.

**12.** Defendants contend that part of the $850,000 Pepco paid to United Rigging in settlement of United Rigging's lawsuit was paid to reimburse United Rigging for its outlay in remediating the United Rigging's site, and therefore the total expenditures by Pepco exceed $3.25 million.

**13.** Cal Union policy No. ZCV 00 62 31 (quoted in Defendants' Joint Statement of Material Facts at ¶ 153) (emphasis added).

**14.** *E.g., Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir.1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988); *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chemical Co.*, 842 F.2d 977 (8th Cir.) (*en banc*), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988).

another meaning to laymen.'" *Holt v. George Washington Life Ins. Co.*, 123 A.2d 619, 622 (D.C.1956) (quoting with approval *Buchanan v. Mass. Protective Ass'n*, 223 F.2d 609, 611 (D.C.Cir.), *cert. denied*, 350 U.S. 833, 76 S.Ct. 67, 100 L.Ed. 743 (1955)). The insurer also has a duty to "spell out in the plainest terms any exclusionary or delimitating policy provisions." *Loffler v. Boston Ins. Co.*, 120 A.2d 691, 693 (D.C.1956) (quoted with approval in *Nationwide Mutual Ins. Co. v. Schilansky*, 176 A.2d 786, 788 (D.C.1961)). Finally, any ambiguities in an insurance policy must be construed against the insurer. *Loffler v. Boston Ins. Co.*, 120 A.2d at 693; *Meade v. Prudential Ins. Co.*, 477 A.2d 726, 728 (D.C.1984).

■ Courts in jurisdictions which similarly protect the insured against legalistic interpretations of provisions in insurance policies have found that environmental response costs are "damages" and therefore are covered under this type of liability clause. For example, the rules in New York governing the interpretation of the provisions of insurance contracts are similar to those in the District of Columbia.[15] The Second Circuit, applying New York law in *Avondale Industries, Inc. v. Travelers Indemnity Co.*, 887 F.2d 1200 (2d Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990), found environmental response costs are covered as "damages" under a standard CGL policy. The court stated:

> Here the term damages is not defined in [the applicable] policy. Damages not being given any more limited definition in the policy must be construed to include

the remedial costs that may be imposed on [plaintiff] by the [state].

*Id.* at 1207. The court rejected the insurance company's argument that environmental response costs should not be covered because such costs stem from equitable, rather than legal, actions and further found that "an ordinary businessman reading this policy would have believed himself covered for the demands and potential damage claims now being asserted in the [state] administrative proceeding." *Id.* Given the similar approach used by New York and District of Columbia courts in their interpretations of insurance contracts, we find this case to be strongly persuasive. *See also Aerojet–General Corp. v. Superior Court*, 211 Cal.App.3d 216, 257 Cal. Rptr. 621, 628 (1989) (a reasonable person would not expect insurance coverage to be denied because a suit was in equity rather than in law).

Defendants place great reliance on the reasoning of *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir.1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988) ("*Armco*"), which held that environmental remediation costs were not covered under a CGL policy.[16] *Id.* at 1350. The court in *Armco* came to this conclusion after determining that the term "damages" in the liability clause only encompassed legal, and not equitable, remedies. "Damages," the Fourth Circuit stated, "as distinguished from claims for injunctive or restitutionary relief, includes only payments to third persons when those persons have a legal claim for damages." *Id.* at 1352 (quotations and citations omitted). Thus damages, according to the

---

15. *See, e.g., Doyle v. Allstate Ins. Co.*, 1 N.Y.2d 439, 154 N.Y.S.2d 10, 14, 136 N.E.2d 484, 487 (N.Y.1956) (terms in an insurance policy are to be given a "natural and reasonable meaning"); *Seaboard Surety Co. v. Gillette Co.*, 476 N.E.2d 272, 275 (N.Y.1984) (an insurer must draft exclusions in "clear and unmistakable" language); *Insurance Co. of North America v. Dayton Tool & Die Works, Inc.*, 57 N.Y.2d 489, 457 N.Y.S.2d 209, 213–14, 443 N.E.2d 457, 461–62 (N.Y.1982) (any ambiguities in a policy are to be resolved in favor of the insured).

16. *Armco* established the distinction between the two categories of remedies because it found that if a comprehensive general liability policy

was held to cover both legal and equitable remedies, then the terms "as damages" would be superfluous in the policy. That is, if the term damages covers both legal and equitable remedies, then the liability policy would indemnify the insured for all costs it is legally liable to pay. The court in *Armco* reasoned that if this was the intention of the parties, the policy would read: the insured shall be reimbursed for "all sums which it is legally liable to pay." 822 F.2d at 1352; *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chemical Co.*, 842 F.2d 977, 986 (8th Cir.) (*en banc*), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988).

court in *Armco,* are given a "somewhat narrow, technical definition" in insurance contracts. *Id; see also Continental Ins. Cos. v. Northeastern Pharmaceutical & Chemical Co.,* 842 F.2d 977, 986–87 (8th Cir.) (*en banc*), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) ("NEP-ACCO") (establishing a similar definition for "damages"). More recently, our Court of Appeals has refused to follow the 8th Circuit's decision in NEPACCO stating in pertinent part that:

> Our research reveals that with the exception of NEPACCO, in every case in which the operative state's rules of insurance contract interpretation required—as Missouri does—resort to the common and ordinary understanding of language, the word "damages" has been construed to cover reimbursement for environmental response costs insured by a government.

*Independent Petrochemical Corporation, et al. v. Aetna Casualty & Surety Co., et al.,* 944 F.2d 940, 946 (D.C.Cir.1991). We see no reason to differentiate between environmental response costs incurred by a government or, as is the present case, by a private party such as plaintiff.

Given the spirit of District of Columbia insurance law, we disagree with the result in *Armco* and its holding that the term "damages" should have a "narrow, technical definition." Such an interpretation would contravene well-established principles of insurance contract interpretation which require that the terms of an insurance policy be construed according to "the understanding of the ordinary person, that is to say they will be given the meaning that common speech imparts." *American Ins. Co. v. Tutt,* 314 A.2d 481, 485 (D.C.1974). Consequently, we decline to hold that the term "damages" is limited to those obligations that are incurred in actions at law. We agree with the long line of judicial decisions that have found both legal and equitable remedies to be covered by the term "damages." [17] *See New Castle County v. Hartford Accident and Indem.*

*Co.,* 673 F.Supp. 1359, 1365 (D.Del.1987) ("an ordinary definition of the word 'damages' makes no distinction between actions at law and actions in equity"), *aff'd in pertinent part,* 933 F.2d 1162 (3d Cir. 1991); *Chesapeake Utilities Corp. v. American Home Assurance Co.,* 704 F.Supp. 551, 559–560 (D.Del.1989) (a definition of damages which "is grounded upon the ancient division between law and equity" would not be an ordinary and accepted meaning in the context of insurance policy interpretation); *National Indem. Co. v. U.S. Pollution Control, Inc.,* 717 F.Supp. 765 (W.D.Okla.1989) (ordinary definition of damages makes no distinction between legal and equitable remedies, therefore coverage should be provided for environmental clean-up and response costs); *Intel Corp. v. Hartford Accident and Indem. Co.,* 692 F.Supp. 1171, 1186–93 (N.D.Cal.1988) (reasonable and normal expectation of the parties is that polluter would be reimbursed by insurance company for costs incurred in cleaning up pollution site pursuant to a consent decree entered into between polluter and the EPA); *Boeing Co. v. Aetna Cas. and Sur. Co.,* 113 Wash.2d 869, 784 P.2d 507 (1990) (same); *C.D. Spangler Construction Co. v. Industrial Crankshaft & Engineering Co.,* 326 N.C. 133, 388 S.E.2d 557, 568 (1990) (same; stating if "the insurer intended that 'damages' have [only the meaning of legal damages] it should have so indicated on the policy").

■ To distinguish between legal and equitable remedies makes little sense in the context of environmental response costs. Although suits for environmental response costs are traditionally considered equitable because they seek restoration or restitution for damage to property, they are still fundamentally concerned with damage to property. When an insured seeks indemnification for environmental response costs, the insured is seeking reimbursement of funds paid to remedy that damage. As another district court has stated:

---

**17.** Such a holding is consistent with the trend of modern jurisprudence to abolish the procedural distinctions between actions at law and those in equity. For example, federal courts have abolished a division between law courts and equity courts since 1937. *See* 2 J. Moore, *Moore's Federal Practice* ¶ 2.06 (2d ed. 1986).

In this context the argument concerning the historical separation of damages and equity is not convincing and it seems to be that the insured ought to be able to rely on the common sense expectation that property damage within the meaning of the policy includes a claim which results in causing him to pay sums of money because his acts or omissions affected adversely the rights of third parties. While such claims might be characterized as seeking "equitable relief," the cleanup costs are essentially compensatory damages for injury to [property].....

*United States Fidelity and Guar. Co. v. Thomas Solvent Co.,* 683 F.Supp. 1139, 1168 (W.D.Mich.1988), *vacated,* No. K85–415, 1988 U.S.Dist. LEXIS No. 3560 (W.D.Mich. March 16, 1988).[18]

■ In the instant case, there is a clear allegation of property damage. Pepco sold United Rigging the transformers for scrap. Oil from the transformers containing PCBs at the United Rigging site clearly caused damage to property. This damage does not change in nature just because United Rigging and Pepco cleaned up the polluted site in order to avoid becoming liable to state and federal environmental authorities under environmental legislation.[19]

In sum, we find that the sums Pepco expended to remediate the United Rigging site constitute "damages" as the term is used in the CGL policies issued to plaintiff by the defendants.[20] We therefore grant Plaintiff's Motion for Partial Summary Judgment on this issue.

2. Defendants' Joint Motion for Summary Judgment as to Environmental Response Costs

This motion filed concurrently with plaintiff's similar motion for partial summary judgment opposes plaintiff's motion on several of the grounds previously discussed in connection with plaintiff's motion. In summary, defendants contend that Maryland law is applicable to the issues presented because Maryland has the most substantial interest, that this litigation is controlled by the 4th Circuit's decision in *Armco,* and that the 4th Circuit in *Armco* determined that under Maryland law the environmental response costs paid by plaintiff are not sums that plaintiff was "legally liable to pay as damages." We have previously considered each of these issues in deciding plaintiff's motion. Relying on the reasons already stated, we deny Defendant's Joint Motion for Partial Summary Judgment.

3. Motion of Certain Defendants[21] for Summary Judgment as to Environmental Response Costs

While participating in the joint motion of all defendants for summary judgment as to environmental response costs, this separate motion was filed in order to emphasize the position of these particular defendants that the policies for which plaintiff seeks coverage do not cover "restitutionary relief such as the cost of complying with government-mandated environmental remediation requirements." Memorandum of Certain Defendants in Support of their Motion for Summary Judgment as to Environmental Response Costs, p. 1.

This separate motion repeats the claim by all defendants that the excess liability policies do not cover restitutionary or equitable relief ordered against an insured and that environmental response costs are equitable in nature. We have previously considered this position in dealing with

18. Although Judge Enslen vacated this opinion when he certified this issue for appeal in an order dated March 16, 1988, we find his reasoning in this opinion highly persuasive.

19. Even if we were to find that the term "damages" only applied to legal actions, the monies Pepco spent to remediate the United Rigging site could easily be characterized as money spent to settle the lawsuit brought against Pepco by United Rigging.

20. Because we hold that there is no reason to distinguish between legal and equitable remedies when interpreting the term "damages" we do not need to rely upon plaintiff's alternative argument that the language used in the policies in the case at hand provides a broader range of coverage than a standard CGL policy.

21. Defendants North River Insurance Company, American Centennial Insurance Company, and Certain Underwriters at Lloyd's, London, and Certain London Market Insurance Companies.

plaintiff's Motion for Partial Summary Judgment and find no need for further discussion.

■ Defendants also claim that the public policy underlying CERCLA which authorizes the government to require parties to remediate pollution weighs against finding that such costs are insurable. Finally, defendants claim that environmental response costs cannot be insured by the excess liability policies at issue.

With respect to the policy of CERCLA, which grants certain powers of remediation to the federal government, we hold that such policy arises from a statute of recent origin (1980) and has no relevance to the matter at issue, *i.e.*, the interpretation of private insurance contracts. On the contrary, numerous cases have held that environmental response costs are insurable.

4. Defendants' Joint Motion for Summary Judgment as to the Pollution Exclusion.

5. Defendant California Union's Summary Judgment based on Seepage and Exclusion Clauses that do not Include the Word "Sudden".

■ In the second set of summary judgment motions, defendants argue that plaintiff's expenditures in cleaning up the United Rigging site are not reimbursable under the policies as a matter of law because these expenditures are covered by pollution exclusion clauses contained in each of the twenty-one general liability policies at issue in this case. Plaintiff contends that the pollution exclusion clauses do not apply because of certain exemptions to said clauses.

The parties admit that plaintiff's claims were caused either directly or indirectly by "seepage, pollution or contamination," and that these losses therefore fall within the pollution exclusion clauses of the applicable policies.[22] The dispute here is whether these losses arose from events for which coverage should be provided because the events fall under certain exceptions in the pollution exclusion clauses. It appears courts are divided over whether it is the insured or the insurer who has the burden of proving that an exception to an exclusion clause applies to a claim. *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 702 F.Supp. 1317, 1328–29 (E.D.Mich.1988) (quoting 19 Couch, *Insurance*, § 79:385 at 338 (2d ed. 1983). It is not necessary at this point that we decide this question.

By way of explanation, there are two general types of pollution exclusion clauses at issue in this case. The first general type is comprised of pollution exclusion clauses which contain the word "sudden." These clauses exempt pollution damages from coverage unless the "discharge, dispersal, release or escape is sudden and accidental."[23] The second type does not contain the word "sudden" in the exception. These policies deny coverage under seepage and pollution exclusion unless the "happening" which caused the pollution was "unintended" and "unexpected."[24] Cal Union, the

22. According to Defendant Cal Union, Pepco stated that the "happenings" which occurred in this case were "[t]he series of acts by United Rigging of exposing the United Rigging property to PCB contamination by spilling into the ground mineral oil containing PCBs from transformers which had been bought by United Rigging from Pepco." Memorandum of Cal Union Insurance Company In Support of Its Motion for Summary Judgment Based on the "Seepage and Pollution" Clauses that Do Not Include the Word "Sudden" ("Cal Union's Motion") at 6 (quoting Pepco's Responses to Cal Union's First Set of Interrogatories).

23. There are two clauses in this category. Some policies exclude coverage for pollution unless the "discharge, dispersal, release or escape is sudden and accidental." *See* Defendants' Joint Statement of Material Facts As to Which There is No Genuine Issue ("Defs.Jt.St.") ¶¶ 182–183. Other policies in this category exclude coverage for pollution except where the "seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening." *See* Defs.Jt.St. ¶¶ 174–177. Defendants admit in their motion that there is no material difference between these two clauses. These clauses are the subject of a single motion which seeks to exclude coverage under all clauses which contain the word "sudden." This motion was filed by the eight active defendants: Cal Union, North River, London Defendants, Wausau, American Centennial, Southern American, First State and National Union.

24. A representative example of such a clause:
This policy does not cover any liability for: 1. Personal injury or loss of, damage to, or loss

only insurance company that issued a clause in the second category, has filed a second summary judgment motion for those clauses which do not contain the word "sudden."

The applicability of any stated exception to an exclusion clause is complicated in the instant case by the fact that there are two parties which were legally responsible for the environmental damage: Pepco, which sold the scrap transformers to United Rigging; and United Rigging, whose subsequent handling of the transformers caused the environmental damage.[25] To decide whether the stated exception to the pollution exclusion clause applies in this case, we must determine whether the exception applies only to pollution that is unexpected and unintended from the point of view of Pepco, or unexpected and unintended from the point of view of United Rigging. The same determination must be made with respect to the two policies whose exceptions are for pollution which is "sudden or accidental."

The pollution exclusion clauses do not give any guidance as to whose point of view should be considered when considering the nature of these happenings. The above two motions which concern the seepage and pollution exclusions and the exception to said exclusions also put in issue a number of disputed facts including, but not limited to, the circumstances of plaintiff's original processing and sale of transformers for scrap, whether plaintiff expected the spillage of oil containing PCBs by the employees of United Rigging, the circumstances under which the property of United Rigging became polluted, when plaintiff became aware of such events, and whether plaintiff gave proper notification. It is

clear that these are genuine issues of material fact which preclude the granting, at this time, of defendants' motions relating to the pollution exclusion clauses.

An order reflecting our actions on the several motions considered in this memorandum has been entered this day.

## ORDER

Upon consideration of the below-listed motions, the accompanying oppositions, and the entire record herein, and for the reasons stated in the Opinion entered on this day, it is by the court this 30th day of September, 1991

ORDERED that Plaintiff's Motion for Partial Summary Judgment is hereby granted; and it is

ORDERED that Defendants' Joint Motion for Summary Judgment As to Environmental Response Costs is hereby denied; and it is

ORDERED that the Motion of Defendants North River Insurance Company, American Centennial Insurance Company, Certain Underwriters at Lloyds, London and Certain London Market Insurance Companies for Summary Judgment As To Environmental Response Costs is hereby denied; and it is

ORDERED that Defendants' Joint Motion for Summary Judgment As to the Pollution Exclusion is hereby denied; and it is

FURTHER ORDERED that California Union Insurance Company's Motion for Summary Judgment Based on the "Seepage and Pollution" Clauses that Do Not Include the Word "Sudden" is hereby denied.

---

of personal injury or loss of, damage to, or loss of use of property directly or indirectly caused by seepage, pollution or contamination, provided always that this paragraph (1) shall not apply to liability for personal injury or loss of or physical damage to or destruction of tangible property, where such seepage, pollution or contamination is caused by an *unintended and unexpected* happening during the period of this policy.
Cal Union's excess liability policy No. ZCX 00 65 59 (emphasis added) (quoted in Cal Union's Motion at 3).

**25.** Defendants contend the following activities by United Rigging caused the pollution: deliberate spraying of PCB-contaminated mineral oil from scrap transformers into the property to control dust, burning PCB-contaminated mineral oil, spilling mineral oil onto property while dismantling the scrap transformers, and leaving the transformers outside without protection causing them to fill with rainwater and allowing this liquid to spill onto the ground. Cal Union's Motion at 6.

## APPENDIX ONE

### POTOMAC ELECTRIC & POWER COMPANY
### EXCESS LIABILITY FIRST LAYER POLICY SUMMARY
### POLICY PERIODS 1980–85

| POLICY PERIOD | LAYER | LIMIT OF LIABILITY | CARRIER | POLICY NO. | % OF PARTICIPATION | SELF-INSURED RETENTION | MAXIMUM COVERAGE |
|---|---|---|---|---|---|---|---|
| 10/31/84–10/31/85 | 1st | $4.5M | California Union | ZCV006749 | 100.0 | $500,000 | $4.5M |
| 10/31/83–10/31/84 | 1st | $4.5M | California Union | ZCV006559 | 100.0 | $500,000 | $4.5M |
| 10/31/82–10/31/83 | 1st | $4M | California Union | ZCV006231 | 100.0 | $1M | $4M |
| 10/31/81–10/31/82 | 1st | $4M | North River | JU1064 | 50.0 | $1M | $2M |
|  |  |  | Wausau | 573200100260 | 50.0 | $1M | $2M |
| 03/01/81–10/31/81 | 1st | $5M | Lloyd's & Various Ins Cos | ULL1282147 | 100.0 | $1M | $5M |
| 03/01/80–03/01/81 | 1st | $4M | North River | JU0817 | 67.5 | $1M | $2.7M |
|  |  |  | American Centennial | CC001216 | 25.0 | $1M | $1M |
|  |  |  | Southern American | XG860075 | 7.5 | $1M | $300,000 |

28471

### POTOMAC ELECTRIC & POWER COMPANY
### EXCESS LIABILITY SECOND LAYER POLICY SUMMARY
### POLICY PERIODS 1980–85

| POLICY PERIOD | LAYER | LIMIT OF LIABILITY | CARRIER | POLICY NO. | % OF PARTICIPATION | FIRST-LAYER LIABILITY LIMIT | MAXIMUM COVERAGE |
|---|---|---|---|---|---|---|---|
| 10/31/84–10/31/85 | 2nd | $20M | California Union | ZCX007419 | 50.0 | $5M | $10M |
|  |  |  | Transit Casualty | FXS960559 | 50.0 | $5M | $10M |
| 10/31/83–10/31/84 | 2nd | $20M | California Union | ZCX006733 | 50.0 | $5M | $10M |
|  |  |  | Transit Casualty | FXS960455 | 50.0 | $5M | $10M |
| 10/31/82–10/31/83 | 2nd | $20M | California Union | ZCX006389 | 50.0 | $6M | $10M |
|  |  |  | Transit Casualty | FXS960365 | 50.0 | $5M | $10M |
| 10/31/81–10/31/82 | 2nd | $20M | California Union | ZCX006015 | 50.0 | $5M | $10M |
|  |  |  | First State | 914197 | 25.0 |  | $5M |
|  |  |  | Transit Casualty | FXS960281 | 25.0 |  | $5M |
| 03/01/81–10/31/81 | 2nd | $5M | Lloyd's & Various | UKL1702147 | 100.0 | $6M | $5M |
| 03/01/80–03/01/81 | 2nd | $5M | North River | JU0818 | 70.0 | $5M | $3.5M |
|  |  |  | California Union | ZCX003992 | 20.0 | $5M | $1M |
|  |  |  | National Union Fire | 9782536 | 10.0 | $5M | $500,000 |

