CITY OF EDGERTON, and Edgerton Sand & Gravel, Inc.,
Plaintiffs-Respondents,

v.

GENERAL CASUALTY COMPANY OF WISCONSIN,
Defendant-Appellant,†

WISCONSIN INSURANCE SECURITY FUND, Defendant,

AETNA CASUALTY & SURETY COMPANY, Defendant-Co-
Appellant,††

HANOVER INSURANCE COMPANIES, Wausau Insurance
Companies, and Local Government Property Insurance
Fund, Defendants.

Court of Appeals

*No. 91–1408. Submitted on briefs July 14, 1992.—Decided
November 25, 1992.*

(Also reported in 493 N.W.2d 768.)

†Petition to review granted.
††Petition to review granted.

522

For the defendant-appellant the cause was submitted on the briefs of *Thomas N. Harrington* and *Heidi L. Vogt* of *Cook & Franke S.C.* of Milwaukee.

For the defendant-co-appellant the cause was submitted on the briefs of *Thomas R. Schrimpf* and *Susan R. Tyndall* of *Hinshaw & Culbertson* of Milwaukee.

For the plaintiffs-respondents the cause was submitted on the briefs of *James A. Olson* and *Steven J. Schooler* of *Lawton & Cates, S.C.* of Madison.

Amicus Curiae brief was filed by *Joseph J. Muratore, Jr.* of Racine, attorney, and *Thomas J. Dawson* of Madison, and *Eugene R. Anderson, Robert M. Horkovich, Carol A. Matthews* and *Bruce A. Brown*, of counsel, of New York, for Wisconsin Public Intervenor and Wisconsin's Environmental Decade.

Amicus Curiae brief was filed by *Thomas C. Ewing* and *Douglas B. Clark* of *Foley & Lardner* of Madison, for Wisconsin Policyholders Association.

Amicus Curiae brief was filed by *Robert C. Burrell* of *Borgelt, Powell, Peterson & Frauen, S.C.* of Milwaukee, attorneys, and *Thomas W. Brunner, Marilyn E. Kerst* and *James P. Anasiewicz* of *Wiley, Rein & Fielding*, of counsel, of Washington, D.C., for Wisconsin Insurance Alliance and Insurance Environmental Litigation Association.

Before Sundby, Cane and LaRocque, JJ.

SUNDBY, J.   Edgerton Sand & Gravel, Inc. (ES& G) owns a landfill site in Rock County which it closed December 30, 1984. During 1984 and 1985 it capped the landfill. The city of Edgerton leased the site for a municipal landfill from approximately 1968 to 1984. In 1984 volatile organic compounds (VOCs) were detected in the groundwater under, and in the vicinity of, the site.

By certified letter dated June 22, 1989, the United States Environmental Protection Agency (EPA), pursuant to section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act

(CERCLA)[1] [42 U.S.C. § 9604(e)], informed ES&G and the city that it was investigating the circumstances surrounding the presence of hazardous substances in and around the ES&G site. EPA requested that ES&G, the city, and other potentially responsible parties (PRPs) respond to the Wisconsin Department of Natural Resources (DNR) with detailed information as to the disposal of hazardous substances at the site from 1950 to 1984.[2] On July 7, 1989, the city forwarded EPA's letter to its insurer, General Casualty Company of Wisconsin, and advised: "[w]e are insisting that you accept tender of coverage immediately and . . . request that you retain independent expert counsel for the City of Edgerton to represent the City in this matter."

General Casualty also insured ES&G against liability for property damage and personal injury arising out of its ownership and use of the landfill.[3] On July 20,

---

[1] Codified, as amended, at 42 U.S.C. §§ 9601-9675, commonly referred to as Superfund.

[2] EPA's letter stated:

The United States Environmental Protection Agency (U.S. EPA) is presently investigating the circumstances surrounding the presence of hazardous substances in and around the Edgerton Sand & Gravel Site in Rock County . . . .

Pursuant to the authority of Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9604(e), amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. 99-499 [SARA], and pursuant to Section 3007 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6927, you are hereby requested to respond to the following Information Requests. Compliance with the following Information Requests is mandatory.

[3] General Casualty provided primary general liability coverage of the landfill to ES&G for the policy periods January 1, 1984, to January 1, 1985; and January 1, 1985, to January 1, 1986. It provided primary general liability coverage to the city for the policy year beginning April 1, 1982, and each year thereafter to

1989, ES&G forwarded EPA's letter to General Casualty and requested that it provide ES&G with defense coverage and pay any costs ES&G "may have regarding this site."

By certified letter dated February 27, 1990, DNR gave the PRPs thirty days to propose a PRP-implemented remediation work plan to clean up the site and remediate the environmental problems associated with the site, or face listing of the site on CERCLA's National Priorities List (NPL), or state action.[4] On April 23, 1990, ES&G notified its excess liability insurer, Aetna Casualty and Surety Company, that ES&G had received EPA's Information Request letter and DNR's enforcement letter of February 27, 1990. ES&G requested that Aetna accept coverage of defense costs and any liability ES&G might incur as a result of EPA's and DNR's potential claims. General Casualty and Aetna denied coverage and refused to provide ES&G and the city with a defense.

ES&G and the city began this action December 20, 1990, seeking a declaration that General Casualty and Aetna are obligated under their policies to defend them

---

April 1, 1986. However, ES&G and the city agree that General Casualty's policies commencing after 1984 do not provide coverage. Iowa National Mutual Insurance Company provided ES&G with primary comprehensive general liability coverage from January 1, 1973, to January 1, 1984; and the city with primary comprehensive general liability coverage from April 1, 1977, through April 1, 1981. However, Iowa National is insolvent. Aetna provided ES&G with excess indemnity (umbrella) coverage from April 9, 1974, to April 9, 1977. It did not cover the city at any time.

[4] A work plan was not prepared until July 1991. FOTH AND VAN DYKE, WORK PLAN FOR LANDFILL CLOSURE AND GROUNDWATER REMEDIAL INVESTIGATION/FEASIBILITY STUDY (July 11, 1991), filed with DNR, Southern District Headquarters.

against, and indemnify them for, any liability arising out of EPA's and DNR's claims, actions or suits involving the landfill. ES&G and the city also stated a claim against General Casualty and Aetna for bad faith in refusing to provide them with a defense.

ES&G and the city filed a motion for summary judgment on March 26, 1991. On April 26, 1991, General Casualty filed a cross-motion for summary judgment, claiming that no "suit seeking damages" had been filed which triggered its duty to defend. It further contended that the insureds' failure to give it timely notice of an "occurrence" or claim, as required by its policies, relieved it of any obligation to provide its insureds with coverage under its policies. It also requested that the trial court dismiss the insureds' bad faith claim. On April 29, 1991, Aetna filed a substantively identical cross-motion for summary judgment. In the alternative, General Casualty and Aetna each moved the trial court for a continuance to permit it to conduct additional discovery.

On May 10, 1991, the trial court granted ES&G's and the city's motion for summary judgment and denied General Casualty's and Aetna's cross-motions, except on the insureds' bad faith claims, which it dismissed. The court did not rule on General Casualty's and Aetna's motions for a continuance.[5]

On July 18, 1991, the circuit court entered an amended judgment. General Casualty and Aetna appeal. ES&G and the city do not appeal from that part of the judgment which dismissed their bad faith claim. We affirm that part of the judgment which denied General Casualty's and Aetna's cross-motions for summary judg-

[5] Our decision moots General Casualty's and Aetna's claim that the trial court abused its discretion when it failed to address their motions.

ment and reverse that part of the judgment which granted ES&G's and the city's motion for summary judgment. We also reverse the judgment in favor of the city against Aetna because Aetna does not insure the city.

## THE ISSUES

When confronted with cross-motions for summary judgment, the reviewing court must rule on each party's motion on an individual basis. Each motion must be denied if material factual issues exist as to the motion. 10A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2720 (2d ed. 1983). *See also Ziegler Co., Inc. v. Rexnord, Inc.*, 139 Wis. 2d 593, 595 n.1, 407 N.W.2d 873, 875 n.1 (1987); *Grotelueschen v. American Family Ins. Co.*, 171 Wis. 2d 437, 492 N.W.2d 131 (1992) (Abrahamson, J. dissenting). In most respects, Wisconsin's summary judgment statute, sec. 802.08, Stats., is substantially the same as Rule 56, Fed. R. Civ. P., which governs summary judgment procedure in the federal district courts. We conclude that this construction of the federal rule is consistent with Wisconsin summary judgment methodology. We, like the federal appellate courts, review the trial court's decision by applying, just as the trial court applied, the standards and methods set forth in the summary judgment rule. *Wright v. Hasley*, 86 Wis. 2d 572, 579, 273 N.W.2d 319, 322-23 (1979).

We identify the following issues presented by the parties' motions and cross-motions:

(1) Did issuance of the June 22, 1989 PRP letters by EPA to ES&G and the city under section 104(e) of CERCLA trigger the duty of General Casualty and Aetna to defend their insureds against the Superfund

initiative?[6] We conclude that the insurers' duty to defend was not triggered by the PRP letters of June 22, 1989, but arose when DNR's letter of February 27, 1990, unequivocally imposed upon ES&G and the city the responsibility to remediate and clean up the landfill or bear the expense thereof.[7]

(2)   Are cleanup and remediation costs, which ES&G and the city incur in response to the Superfund initiative, sums which they are obligated to pay "as damages," within the meaning of that term as used in the insurers' policies? We conclude that they are.

(3)   Do the personal injury liability coverage provisions of General Casualty's and Aetna's policies provide coverage for ES&G's and the city's liability for groundwater contamination? We conclude that "personal injury," as defined in General Casualty's and Aetna's policies, includes injury to the groundwater.

(4)   Do General Casualty's policies exclude coverage because ES&G and the city expected or intended that contaminants would leach into the groundwater from the landfill? We conclude that General Casualty's basic policy's "expected" or "intended" exclusions do not apply to personal injury liability coverage under Coverage P, applicable to ES&G, or to the Broad Form Extended Liability Coverage Endorsement, applicable to

[6] In this opinion, "Superfund initiative" refers to the administrative proceedings begun by EPA's section 104(e) CERCLA letter and includes DNR's environmental repair efforts under secs. 144.442 and 144.442(8), Stats. Under sec. 144.442(8), DNR may advise, consult, assist and contract with any interested person to implement the federal Superfund Act. It may also contract directly with EPA.

[7] When we refer to clean up or remediation of the landfill or the site, we include the environmental problems associated with the site which may have been, or are, encountered off-site.

the city. Because coverage of groundwater contamination is provided under the personal injury liability coverage provisions, we need not consider whether coverage for property damage liability is excluded by provisions of General Casualty's basic policy.

(5) Was coverage under the insurers' policies triggered during a policy period? Because the question of the appropriate trigger of coverage for personal injury liability has not been briefed, and the need to answer that question may be obviated by the evidence at trial, we do not reach this issue.

(6) Is the cost of cleaning up and remediating the landfill site itself excluded from coverage under the policies' owned-property exclusion? We conclude that where, as here, the purpose of remedial work on the insured's property is to repair or prevent environmental damage, the cost of such work is not excluded by the owned-property exclusion.

(7) Is any party entitled to summary judgment on the question of whether General Casualty and Aetna were prejudiced by the insureds' untimely notice of an "occurrence" or claim? We conclude that there is a genuine issue of material fact as to whether General Casualty and Aetna were prejudiced by ES&G's and the city's untimely notices, which precludes the grant of summary judgment to any party.

(8) Has the policy limit of Iowa National's underlying policy been exhausted by payments by ES&G so that Aetna's duty to defend has been triggered? Did ES&G and the city attempt to insure a known loss when they contracted with General Casualty? We conclude that these are issues for trial.

## I. SUPERFUND INITIATIVE AS "SUIT"

General Casualty's policies[8] provide: "[T]he .company shall have the Oright and duty to defend any *suit* against the insured *seeking damages* on account of . . . bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . .." (Emphasis added.) Coverage P for Personal Injury Liability, contained in ES&G's policy and General Casualty's Broad Form Extended Liability Coverage Endorsement for personal injury liability applicable to the city, contain substantively identical language. Aetna's policy provides: "The company shall defend any *suit seeking damages* which are not payable on behalf of the insured . . . because of exhaustion of an underlying aggregate limit of liability by payment of claims . . .." (Emphasis added.)

General Casualty and Aetna argue that the Superfund process did not commence a "suit" against their insureds because the term "suit" "[i]n plain language refers to court proceedings."[9] The traditional view

---

[8] General Casualty's policies are standard-form comprehensive general liability (CGL) insurance policies developed for the insurance industry by the Insurance Services Office and its predecessor agencies. For a general discussion of the development of CGL policies, see 7A JOHN A. APPLEMAN, INSURANCE LAW AND PRACTICE § 4491 (1979 & Supp. 1992); *see also* MITCHELL L. LATHROP, INSURANCE COVERAGE FOR ENVIRONMENTAL CLAIMS ch. 3, General Liability Insurance (1992) (hereinafter ENVIRONMENTAL CLAIMS INSURANCE). Aetna's excess liability policy differs in some material respects from the standard-form CGL.

[9] The Insurance Services Office's Occurrence-Commercial General Liability policy, effective January 1, 1986, which replaced the standard-form CGL policy, defines "suit" to "mean[ ] a civil proceeding in which damages . . . to which this insurance applies are alleged. . .." DONALD S. MALECKI & ARTHUR L. FLITNER, THE

is that a mere claim against the insured is insufficient to trigger the duty to defend. Thomas A. Gordon & Roger Westendorf, *Liability Coverage for Toxic Tort, Hazardous Waste Disposal and Other Pollution Exposures*, 25 IDAHO L. REV. 567, 609 (1988-89). The authors state:

> Until a "suit" was filed, the courts were reluctant to recognize an obligation by the insurer to defend. More recent decisions, however, have broadened the word "suit" to include any adjudicatory proceeding before an administrative or quasi-judicial forum. *Courts considering the issue of whether a notice letter to PRPs from a federal or state regulatory agency pursuant to environmental statutes triggers the existence of a duty to defend have reached opposite conclusions.*

*Id.* at 609-10 (citations omitted; emphasis added).

Those courts which have held that a duty to defend is not triggered by federal or state administrative environmental initiatives have applied to the word "suit" a "plain language" rule. Representative of the decisions of those courts is *Arco Indus. Corp. v. Travelers Ins. Co.*, 730 F. Supp. 59 (W.D. Mich. 1989). There, the court said:

> In this case, the insurance contract limits the duty to defend to those instances where the insured is the subject of a "suit." While the contracts do not define the term "suit," that term has a well-accepted ordinary meaning. In plain language, the term refers to court proceedings.

NEW CLAIMS-MADE AND OCCURRENCE FORMS, COMMERCIAL GENERAL LIABILITY 11-12 (2nd ed. 1986).

*Id.* at 66.[10]

The "plain-language" courts frequently cite a dictionary definition of "suit": "an action or process in a court for the recovery of a right or claim." *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.*, 475 N.W.2d 607, 627 (Iowa 1991) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2286 (P. Gove ed. 1961)). Other courts, however, have pointed out that "suit" has a second, broader meaning: "the attempt to gain an end by a legal process." *Id. McDonald* lists decisions which have given "suit" a broad definition, and other decisions which have adopted a narrow definition. *Id.* at 627-28 nn. 9-10. Those courts which have interpreted "suit" broadly have considered that proceedings under both federal and state antipollution laws may be lengthy and complex, and government policy is to accomplish cleanup quickly and without judicial intervention if possible. Annotation, *Liability Insurance Coverage for Violations of Antipollution Laws*, 87 A.L.R. 4th 444, § 2[b] (1991 & Supp. 1992).

We disagree with those courts which have found that the word "suit," contained in the standard-form CGL policy, unambiguously requires the initiation of court proceedings before the duty to defend is triggered.

[10] The federal court for the Eastern District of Michigan predicted that the Michigan Supreme Court would arrive at a contrary conclusion. *Higgins Indus., Inc. v. Fireman's Fund Ins. Co.*, 730 F. Supp. 774, 776-77 (E.D. Mich. 1989). However, the Sixth Circuit Court of Appeals predicted that the Michigan Supreme Court would conclude that a PRP letter does not trigger an insurer's duty to defend. *Ray Indus., Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 762-64 (6th Cir. 1992). The court held that "suit" had a plain and unambiguous meaning that excluded the PRP letter in that case.

We also disagree with those courts which hold that the mere receipt of a PRP letter from EPA or a state environmental protection agency causes the duty to defend to arise. We conclude that the duty to defend arises when a federal or state environmental agency identifies a PRP which it unequivocally requires to pay the cost of, or participate in paying the cost of, landfill remediation and clean up. We adopt the reasoning of the court in *Ryan v. Royal Ins. Co. of Am.*, 916 F.2d 731 (1st Cir. 1990).

In *Ryan*, the owner of a site contaminated by hazardous chemicals had what the court termed "somewhat desultory correspondence" with the New York Department of Environmental Conservation regarding closure and cleanup of the site. It sued its insurer, Rural Insurance, for Rural's failure to defend and indemnify it according to the tenor of a series of insurance policies. The court said that the issue was whether the New York Court of Appeals would treat this correspondence as the functional equivalent of a "suit" sufficient to trigger the duty to defend under the policies. The court concluded that it would not. It concluded that an insurer's duty to defend would be determined according to the following principles:

> To sum up, the origins and purpose of the duty to defend seem best accommodated neither by a restrictive suit-cum-judgment rule nor by an expansive "any contact with a government agency is enough" rule, but by focusing instead on the data most relevant to the probability of actual toxic waste liability: coerciveness, adversariness, the seriousness of the effort with which the government hounds an insured, and the gravity of imminent consequences. Since the law holds PRPs to so strict a liability standard, the degree of compulsion the government

wields in pursuing an insured seems an apt proxy for measuring factual expectancy according to the actual probability and immediacy of toxic waste liability.

*Id.* at 741.[11]

General Casualty and Aetna argue that EPA exerted no compulsion by its PRP letter of June 22, 1989,[12] and that DNR's letters were merely invitations to voluntary action. We agree that EPA's Information Request letter of June 22, 1989, did not trigger a duty to defend. Such requests under section 104(e) of CERCLA are, as its title states, "Information Gathering."

However, EPA and DNR proceeded beyond the "information gathering" stage. On November 6, 1989, DNR forwarded to ES&G the responses the department received to the section 104(e) letter "as an opportunity for you and the other potentially [responsible] parties to reach an agreement between yourselves on remediating the environmental problems at the landfill."

On February 27, 1990, DNR notified ES&G by certified letter that, "[A] legally enforceable contract between the Department and the PRP's must be signed within 60 days after a PRP workplan is submitted to the Department, to ensure that the work is completed properly and on schedule." Immediately thereafter, on March 9, 1990, ES&G invited the city "and others" to a meeting to discuss: (1) insurance coverage at the site; (2) forma-

---

[11] *Ryan* was followed in *Colonial Tanning Corp. v. Home Indem. Co.*, 780 F. Supp. 906 (N.D.N.Y. 1991).

[12] General Casualty also claims that there is nothing in the record to show that the city received EPA's letter. General Casualty is wrong. Mary Harding, an attorney representing the city, incorporated in her affidavit the city attorney's letter of July 7, 1989, to General Casualty specifically referring to, and enclosing a copy of, EPA's June 22 letter.

tion of a joint defense group; and (3) formulating a response to DNR's demands.

On February 8, 1991, DNR's Bureau of Legal Services notified ES&G that "unless a PRP group signs a contract with WDNR for this site by May 31, 1991, WDNR will request that this site be listed on the NPL." The bureau warned that if that occurred, EPA would attempt to negotiate Administrative Consent Orders with the PRPs. If unsuccessful, EPA could issue an order requiring the PRPs to undertake clean-up and remediation, or undertake the action itself and sue the PRPs to recover its costs, or EPA could seek forfeitures and treble damages from the PRPs for noncompliance.[13]

DNR's letter informed ES&G that its experience had been "that work done under contract with WDNR goes much quicker, is less complex and less costly than work done on NPL sites." DNR emphasized that a contract with it was the "*only* mechanism acceptable to WDNR" to prevent listing the site on the NPL.[14] On

---

[13] The response actions which EPA may take under Superfund include: removal of hazardous substances and remediation, 42 U.S.C § 9604(a); any other measure consistent with the national contingency plan EPA considers necessary to protect the public health or welfare or the environment, 42 U.S.C. § 9605; abatement, 42 U.S.C. § 9606(a); and recovery of costs and damages, 42 U.S.C. § 9607.

[14] For a description of the purpose and implementation of the National Priorities List, see 57 Fed. Reg. 47,180 (Oct. 14, 1992), to be codified at 40 C.F.R. Part 300. As of October 14, 1992, final and proposed NPL sites totalled 1,236, including forty in Wisconsin. *Id.* at 47,201. To date, EPA has completed approximately 33,000 Preliminary Assessments and approximately 16,000 Site Inspections. *Id.* at 47, 183. Lathrop states that "[s]uggestions have been made that there may be as many as 450,000 potential NPL sites throughout the country." ENVIRONMENTAL CLAIMS INSURANCE § 1.03[2] at 1-14 n.12.

September 12, 1991, ES&G, the city, and other PRPs entered into a contract with DNR pursuant to sec. 144.442, Stats., and CERCLA to investigate the site conditions and remediate the landfill.[15]

The PRPs' election to participate in the Superfund process was voluntary only in the sense that they could have elected not to contract with DNR. However, the acknowledged consequences of that election were NPL listing followed by EPA clean-up and assessment of the costs to the PRPs, possible fines, and probable DNR action if the site could not be cleaned up quickly enough under the Superfund Program.[16] DNR's letter of February 27, 1990, stated: "Quick resolution of the problems associated with the site is the Department's main objective." The PRPs' choice was Hobson's.

We adopt the following statement of the *Ryan* court:

> If government assumes an adversarial posture, making sufficiently clear that the force of the State will be brought promptly to bear in a way that threatens the insured with probable and imminent financial consequences, then the functional equivalent of a suit may be in progress and the insured might reasonably expect the insurer to defend.

---

[15] The contract was pending when the amended judgment was entered July 18, 1991. We take judicial notice of the executed contract and appended work plan which is found in the files of the Environmental Response and Repair Section of the Solid Waste and Hazardous Waste Management Division of DNR (Southern District Headquarters); Edgerton Sand & Gravel Landfill, Contract SF-91-02. *See* sec. 902.01(3), Stats.; George R. Currie, *Appellate Courts Use of Facts Outside of the Record by Resort to Judicial Notice and Independent Investigation*, 1960 WIS. L. REV. 39, 43-45 (1960).

[16] DNR may initiate environmental repair directly under sec. 144.442, Stats.

*Ryan,* 916 F.2d at 741.

In this case, EPA and DNR assumed an adversarial posture toward ES&G and the city, making very clear that failure of ES&G and the city to contract with DNR to remediate and clean up the landfill would inevitably lead to devastating financial consequences for them.[17] ES&G and the city could reasonably expect that their insurers would defend them against the government's coercive actions. The degree of compulsion wielded by EPA and DNR against ES&G and the city is an "apt proxy" for measuring ES&G's and the city's expectation of liability.[18] We mark the degree of compulsion which triggered the insurers' duty to defend as being reached upon receipt of DNR's certified letter of February 27, 1990.[19]

---

[17] "What is obvious is that no matter which enforcement vehicle an environmental regulatory agency elects to use to achieve remediation of a contaminated site, those adjudicated to have been responsible for the creation of the contamination will sooner or later be asked to pay." ENVIRONMENTAL CLAIMS INSURANCE § 3.03[2] at 3-17.

[18] General Casualty argues that the city may have been treated differently from other PRPs, citing the Interim Municipal Settlement Policy, 54 Fed. R. 51, 071-72 (1989). The record does not support General Casualty's claim. Throughout, the degree of compulsion wielded by EPA and DNR against the city has been the same as that wielded against the other PRPs.

[19] However, Aetna's duty to defend is not triggered until the policy limit of the underlying insurance is exhausted. On the record available to us, we cannot determine whether or when that occurred. That determination shall be made on remand.

## II. SUPERFUND RESPONSE COSTS AS DAMAGES

The duty of an insurer to defend a "suit" is not triggered, however, unless the suit seeks "damages." "[A]bsent the possibility that money damages might be awarded, the insurer would have no duty to defend." *School Dist. of Shorewood v. Wausau Ins. Cos.*, 170 Wis. 2d 347, 366, 488 N.W.2d 82, 88 (1992). While the duty to defend is broader than the duty to indemnify, the insurer has no duty to defend an insured in a "suit" in which the insurer has no economic interest. *Id.* at 364, 488 N.W.2d at 87-88 (citing 7C JOHN A. APPLEMAN, INSURANCE LAW AND PRACTICE § 4683 (1979 & Supp. 1992)). Thus, we must consider whether General Casualty and Aetna have an economic interest in the Superfund initiative. They argue that they do not have such an interest because their policies limit coverage to "sums which the insured shall become legally obligated to pay *as damages*." (Emphasis added.) General Casualty and Aetna contend that Superfund remediation and cleanup costs are not "damages" because those costs are incurred in response to claims for injunctive or restitutionary relief.

In *School Dist. of Shorewood*, the court said that a classification based on the form of the action, as either equitable or legal, is irrelevant. "Where the parties have contracted to limit recovery to a specific quantifiable type of remedy [e.g., damages], a court should not alter the insurance contract to include other types of remedies not contracted for . . .." *Id.* at 369, 488 N.W.2d at 89. The plaintiffs sought declaratory and injunctive relief to remedy inequality of educational opportunity by requiring the defendants to correct racially discriminatory practices. *School Dist. of Shorewood* simply stands for the proposition that "[t]he term 'damages' does not

540

encompass the cost of complying with an injunctive decree."*Id.* at 368, 488 N.W.2d at 89. The court said: "An injunction looks to the future conduct of the parties and is preventive in nature. Damages, on the other hand, are remedial in nature, not preventive." *Id.* at 370, 488 N.W.2d at 90. The *School Dist. of Shorewood* court said that:

> "Damages" as used in these insurance policies unambiguously means legal damages. It is legal compensation for past wrongs or injuries and is generally pecuniary in nature. The term "damages" does not encompass the cost of complying with an injunctive decree.

*Id.* at 368, 488 N.W.2d at 89.

The court said that "in the insurance context the term 'damages' has an accepted technical meaning in law."[20] *Id.* at 368 n.6, 488 N.W.2d at 89 n.6. Therefore, we may not rely on those cases from other jurisdictions which have concluded that the term "damages" in the standard-form CGL policy is ambiguous. However, we

[20] *See Cincinnati Ins. Co. v. Milliken and Co.*, 857 F.2d 979 (4th Cir. 1988); *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir. 1987), *cert. denied*, 484 U.S. 1008 (1988); *Mraz v. Canadian Universal Ins. Co.*, 804 F.2d 1325 (4th Cir. 1986); *A. Johnson & Co. v. Aetna Casualty & Sur. Co.*, 741 F. Supp. 298 (D. Mass. 1990), *aff'd*, 933 F.2d 66 (1st Cir. 1991); *Verlan, Ltd. v. John L. Armitage and Co.*, 695 F. Supp. 950 (N.D. Ill. 1988); *Travelers Ins. Co. v. Ross Elec. of Washington, Inc.*, 685 F. Supp. 742 (W.D. Wash. 1988); *Patrons Oxford Mut. Ins. Co. v. Marois*, 573 A.2d 16 (Me. 1990). *See also* decisions collected in *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 180 n.5 (Minn. 1990).

conclude that Superfund response costs fall readily within the compass of "legal damages."[21]

The Superfund initiative to which ES&G and the city are subject does not look solely to the future conduct of ES&G and the city; it looks to conduct which has already caused injury and will continue to cause injury unless the cause of the injury is eliminated. To the extent that the Superfund initiative will remediate an ongoing injury to the environment, it is preventive. However, the "damages" which ES&G and the city must pay are not confined to future injuries but include "legal recompense for injuries· sustained." *School Dist. of Shorewood*, 170 Wis. 2d at 372, 488 N.W.2d at 91.

In this respect, the following statement of the court in *Upjohn Co. v. Aetna Casualty and Sur. Co.*, 768 F. Supp. 1186, 1199-1200 (W.D. Mich. 1990),[22] expresses a common sense approach, which we adopt:

---

[21] *School Dist. of Shorewood* does not require a contrary conclusion. The school districts cited to the court many CERCLA cases holding that Superfund cleanup costs constitute "damages" under the terms of insurance policies. The court noted the disagreement among courts as to whether cleanup costs under Superfund constitute "damages." The court said:

> The issue of whether cleanup costs constitute "damages" under the terms of an insurance contract has never been addressed by a Wisconsin court. Such an important issue should not be decided in a cursory fashion by this court. Therefore, we decline to adopt or apply the analogy posited by the school districts.

170 Wis. 2d at 374, 488 N.W.2d at 91.

[22] *Upjohn* quoted from *United States Fidelity & Guar. Co. v. Thomas Solvent Co.*, 683 F. Supp. 1139, 1168 (W.D. Mich. 1988), *vacated and dismissed*, 132 F.R.D. 660 (W.D. Mich. 1990), *aff'd*, 955 F.2d 1085 (6th Cir. 1992) (Upon petition for realignment of the parties, the court concluded it no longer had jurisdiction based on diversity.).

[O]nce property damage is found as a result of environmental contamination, cleanup costs should be recoverable as sums that the insured was liable to pay as the result of property damage. In this context the argument concerning the historical separation of damages and equity is not convincing . . . the insured ought to be able to rely on the common sense expectation that property damage within the meaning of the policy includes a claim which results in causing him to pay sums of money because his acts or omissions affected adversely third parties. While such claims might be characterized as seeking "equitable relief" the [cleanup] costs are essentially compensatory damages for injury to common property and for that reason the insured has a duty to defend. . .. [T]he short answer is that from the standpoint of the insured damages are being sought for injury to property. It is that contractual understanding rather than some artificial and highly technical meaning of damages which ought to control.[23] [Citations omitted.]

The legal-equitable distinction to which the *Upjohn* court refers has been rejected by a majority of the courts which have considered whether site remediation and cleanup costs incurred in response to coercive government action are amounts paid by the insured as "damages" under a standard-form CGL insurance policy. See numerous decisions collected in *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 180-81 n.6 (Minn. 1990). *See also Village of Morrisville Water & Light Dept. v. United States Fidelity & Guar. Co.*, 775 F. Supp. 718, 726 n.10 (D. Vt. 1991). In *Village*

---

[23] In Part III we conclude that migration of VOCs from a landfill into the groundwater is an invasion of the right of private occupancy, a "personal injury" under General Casualty's and Aetna's policies. The statement of the *Upjohn* court as to property damage applies with like force to personal injury.

*of Morrisville*, the court concluded that the "clear majority of courts" have held that CERCLA cleanup costs are "damages" under CGL insurance policies.[24] 775 F. Supp. 718, 725-26. *See also Wagner v. Milwaukee Mut. Ins. Co.*, 145 Wis. 2d 609, 613 n.3, 427 N.W.2d 854, 856 n.3 (Ct. App. 1988), *overruled on other grounds, Just v. Land Reclamation, Ltd.*, 155 Wis. 2d 737, 759, 456 N.W.2d 570, 578 (1990).

In *Minnesota Mining & Mfg. Co.*, the federal district court asked whether, under Minnesota law, the costs of complying with directives issued by state and federal environmental agencies to clean up groundwater contamination caused by pollution were covered under the insureds' CGL insurance policies. 457 N.W.2d 175, 176-77. The Minnesota Supreme Court concluded that such costs were covered.

The court noted that liability for groundwater contamination had been recognized in Minnesota for many years. *Id.* at 183. Thus, the insured and the insurers were aware of the potential liability for groundwater contamination at the time they entered into the insurance contracts in question. The court said that the advent of

---

[24] Lathrop states that "[s]ince 1990, most courts that have considered the question have held that the costs of cleaning up environmental damage, costs connected with CERCLA or state statutes, are covered by the CGL insuring agreement which pays 'all sums which the insured shall become legally obligated to pay as damages.'" ENVIRONMENTAL CLAIMS INSURANCE § 3.03[4] at 3-26. Lathrop lists the following states as rejecting the "as damages" defense or which would follow the trend of the majority: California, Colorado, Delaware, Idaho, Illinois, Iowa, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, North Carolina, Vermont, Washington and Wyoming. The "as damages" defense continues to be viable in Maine, Maryland, New Hampshire and New York. *Id.* at 3-26 n.50.

environmental protection statutes "[has] merely changed the form of the liability for groundwater pollution, not the nature of that liability." *Id.*

Likewise, Wisconsin has recognized for many years that one who causes groundwater contamination may be liable therefor. *Anstee v. Monroe Light & Fuel Co.,* 171 Wis. 291, 177 N.W. 26 (1920) (utility plant liable for contamination of adjoining landowner's soil and well). When the parties to this action contracted for comprehensive general liability insurance, it was within their reasonable expectation that coverage would extend to damages caused by groundwater contamination.[25] We agree with the Minnesota court that environmental protection statutes have not changed the nature of such liability, but only the form. We conclude that the insurer may not escape liability for a risk it has insured simply because it is the government rather than a private party which demands that the person responsible repair environmental damage.

Indemnity for sums the insured becomes obligated to pay for causing injury to the groundwater is within the reasonable expectation of an insured operating or using a solid waste landfill. The ultimate test in construing an insurance contract is not what the insurer

---

[25] When General Casualty wrote its policies, several environmental laws were in place imposing potential liability on operators and users of sites at which toxic wastes had been disposed. The federal Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901-6991, was enacted in 1976. CERCLA became effective December 11, 1980. The Wisconsin Hazardous Waste Management Act and its hazardous substance spills legislation were enacted by ch. 377, Laws of 1977. The environmental repair legislation was enacted by sec. 63, 1983 Wis. Act 410.

intended the words of the contract to mean, but what a reasonable person in the position of an insured would have understood the words to mean. *Herwig v. Enerson & Eggen*, 98 Wis. 2d 38, 40, 295 N.W.2d 201, 203 (Ct. App. 1980), *aff'd*, 101 Wis. 2d 170, 303 N.W.2d 669 (1981) ("The test of coverage is what a reasonable person in the position of the insured would have believed to be covered . . .."). ES&G and the city could reasonably have understood that the term "damages" in the policies before us included injury to the groundwater caused by their operation and use of the landfill.

We adopt the reasoning of those courts which have held that costs incurred to prevent future pollution damage of a kind which has already occurred constitute "damages" within the meaning of the standard-form CGL policy. In *Intel Corp. v. Hartford Accident and Indem. Co.*, 692 F. Supp. 1171, 1190 (N.D. Cal. 1988), *aff'd in part; rev'd in part on other grounds*, 952 F.2d 1551 (9th Cir. 1991), the court pointed out that when the parties negotiated the insurance contract, neither party anticipated claims for investigation and cleanup costs under CERCLA.[26] However, what the parties did contemplate was that if Intel became legally obligated to pay damages to a third party because of property damage inflicted by Intel, the insurance carrier would indemnify Intel. The court concluded that as a PRP, Intel was

---

[26] The Sixth Circuit Court of Appeals suggests that CERCLA's PRP approach may represent "a unique legal creation, with no true parallel in any other area of administrative law." *Ray Indus., Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 764 (6th Cir. 1992). We agree with the *Ray* court that that fact does not justify deviating from the plain language of an insurance contract. But that fact also does not justify construing an insurance contract strictly to frustrate the normal expectations of the insured.

legally obligated to pay all costs associated with cleanup of the subject property. The court therefore held that Superfund response costs constituted "damages" within the reasonable and normal expectations of the parties *Id.* at 1189-90. Other decisions reaching the same conclusion are collected in the Annotation, *Liability Insurance Coverage for Violations of Antipollution Laws*, 87 A.L.R. 4th 444, § 5 at 483-85 (1991 & Supp. 1992).

We further conclude that faced with the consequences of inaction, ES&G and the city had a duty to the insurers to mitigate their damages by contracting with DNR to clean up and remediate the landfill. ES&G and the city could have refused to contract with DNR or otherwise respond to the Superfund initiative. Inevitably, the cleanup and remediation work would have been done by EPA or DNR or settling responsible parties, who would have sued ES&G and the city for their share of the costs.

DNR stated that its experience had been that if the necessary work is done by EPA, the cost will be significantly higher than if the work is done under a DNR contract. Insureds have a duty to mitigate damages for the insurers' benefit, either under cooperation clauses such as those contained in the insurers' policies, or under common-law doctrine.[27] 18 COUCH ON INSURANCE 2d § 74:645 (Rev. ed. 1983 & Supp. 1992) ("[I]t is the duty of the insured to do all that he reasonably can to minimize the loss, and a failure to take reasonable care to avoid an increase of the loss may defeat a recovery . . ..."). *See also Howard v. State Farm Mut. Auto. Liab.*

---

[27] General Casualty and Aetna allege as affirmative defenses to this action that ES&G and the city may have failed to mitigate their damages.

*Ins. Co.*, 70 Wis. 2d 985, 993, 236 N.W.2d 643, 647 (1975) ("[T]he general rule does require the damaged party to use reasonable efforts to mitigate the damages."); *Metalmasters of Minneapolis, Inc. v. Liberty Mut. Ins. Co.*, 461 N.W.2d 496, 501 (Minn. Ct. App. 1990) ("Mitigation is a duty the insured performs for the insurer's benefit. Mitigation cost is recoverable so long as it is reasonable and less than the damages would have been without it.").

For the foregoing reasons, we conclude that the term "damages," as used in the policies before us, includes the costs incurred by ES&G and the city in responding to the Superfund initiative.

## III. PERSONAL INJURY LIABILITY COVERAGE

The insurers' policies promise to pay on behalf of the insureds all sums which they become legally obligated to pay as damages because of "personal injury."[28] "Personal injury" is defined to include "wrongful entry or eviction or other invasion of the right of private occupancy." General Casualty and Aetna argue that each of these torts "requires an unprivileged taking of real property from a person claiming a possessory interest." We disagree.

In *Fortier v. Flambeau Plastics Co.*, 164 Wis. 2d 639, 676, 476 N.W.2d 593, 608 (Ct. App. 1991) (citing Comment, *Liability of Landowner for Pollution of Percolating Waters*, 39 MARQ. L. REV. 119, 130 (1955)), we held that "[c]hemicals seeping or percolating through groundwater can constitute an invasion" of another's

---

[28] General Casualty provides coverage to ES&G for personal injury liability through a Coverage P addition to the CGL policy, and to the city through a Broad Form Extended Liability Coverage Endorsement.

interest in the private use and enjoyment of land. We concluded that under section 822(b) of the RESTATE-MENT (SECOND) OF TORTS, "a negligent invasion may be the basis of liability under a private nuisance theory." *Id.* We also held that the intrusion of VOCs into well water may constitute an actionable negligent trespass. *Id.* at 677, 476 N.W.2d at 608 (citing RESTATEMENT (SECOND) OF TORTS § 165 (1965)). None of these "offenses" require dispossession of the land owner.

There is little decisional authority as to whether pollution of another's property "invades" the land-owner's right of private occupancy, within the meaning of that term as used in general liability insurance policies. In *Titan Holdings Syndicate, Inc. v. City of Keene,* 898 F.2d 265, 273 (1st Cir. 1990), the court held that allegations that noxious odors, noise and light emanating from the city's sewage plant unreasonably interfered with the plaintiffs' use of their homestead stated a claim for coverage for liability arising from an "other invasion of the right of private occupancy." In *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co. and Int'l Ins. Co.,* 976 F.2d 1037 (7th Cir. 1992), the court held that negligent conduct which polluted another's property and led to a seal order and imposition of an environmental reclamation lien arguably constituted an "other invasion of the right to private occupancy." In *Pipefitters* the court rejected the insurers' claim that there could be no coverage unless the insured intended to dispossess the landowner of his or her right of occupancy.

In each of these cases, the right invaded was clearly the right of *private* occupancy. The insurers argue that groundwater is public property and therefore contamination of the groundwater cannot constitute invasion of the right of *private* occupancy. We recognize that sec. 144.01(19), Stats., defines "waters of the state" to

include groundwater. The state has not, however, denied landowners their historic rights of access to, and use of, the groundwater for agricultural and domestic uses. At one time in the history of our country, the right of a landowner to use underground water for private purposes was so jealously protected that pollution of a neighbor's groundwater by the landowner's use of percolating waters beneath the surface of the landowner's land was regarded as *damnum absque injuria*; that is, a loss without an injury. Comment, 39 MARQ. L. REV. at 120-24.

The right of a landowner to obtain groundwater for agricultural and domestic uses is recognized and protected in Wisconsin by statute. Landowners may obtain a supply of groundwater by boring or drilling a private well. *See, e.g.*, sec. 144.027(1)(c)-(h), Stats. The legislature has provided compensation, subject to an income limitation, to the owner of a contaminated private well to treat or replace the water source. Section 144.027(7), Stats.

We conclude that access to, and use of, an undefiled underground water supply is a right of private occupancy. The invasion of that right is a personal injury liability which is covered by General Casualty's and Aetna's policies.

## IV.  DAMAGE "NEITHER EXPECTED NOR INTENDED"

General Casualty argues that its policies do not provide coverage to ES&G and the city because they "expected" or "intended" to discharge contaminants from the landfill into the groundwater. General Casualty identifies two policy provisions which, it argues, exclude coverage where the insured expects or intends the act which causes damage: the "occurrence" definition and

550

the pollution exclusion clause. However, by their terms, these provisions apply to bodily injury and property damage liability coverage and not to personal injury liability coverage.[29] General Casualty argues, however, that the pollution exclusion clause and "other terms" of its basic policy "carry over" and apply to personal injury liability coverage under Coverage P and the Extended Liability Coverage Endorsement. General Casualty points out that while Coverage P is not part of ES&G's basic policy, it is attached to the policy "to complete said policy." Also, the endorsement to the city's policy "forms a part of the policy" and "modifies such insurance."

General Casualty's "carry over" argument would be more persuasive if Coverage P and the endorsement did not contain their own definitions and exclusions. Personal injury liability coverage is not triggered by an occurrence, but by an "offense [which] is committed during the policy period." Coverage P and the endorsement do not include a pollution exclusion. Moreover, application of an "expected or intended" exclusion to personal injury liability coverage would have the nonsensical result of making coverage illusory. Plainly, personal injury liability coverage is extended in Coverage P and the endorsement to intentional acts: false arrest, malicious prosecution, defamation, and wrongful entry or eviction or other invasion of private occupancy rights. It would be an unreasonable construction of the policies to conclude that a coverage clause is wholly nullified by an exclusion clause. Insurance contracts should be given a reasonable interpretation and not one which leads to an

---

[29] "Bodily injury" as used in the policies refers to a physical injury. "Personal injury" includes torts against personal rights, which may or may not include physical injury.

absurd result. *Olguin v. Allstate Ins. Co.*, 71 Wis. 2d 160, 165, 237 N.W.2d 694, 697 (1976).

We conclude, therefore, that because coverage for liability for groundwater contamination is extended to ES&G in Coverage P, and to the city in the Extended Liability Coverage Endorsement through personal injury liability coverage, we need not consider whether coverage for that liability under the property damage clause would be excluded if ES&G and the city expected or intended to discharge contaminants into the groundwater.

## V.   TRIGGER OF COVERAGE

We decline to decide whether the trial court correctly concluded that "[t]here is a continuous trigger of coverage for the policies of insurance issued by Aetna and General Casualty." First, the parties have not briefed the question whether the continuous trigger of coverage theory applies where the claim is for liability for personal injury. Second, the evidence at trial may obviate the need to decide this difficult question of law.

General Casualty disagrees with the continuous trigger approach adopted by the trial court, but claims that the record is insufficient to permit any intelligent discussion of the issue. Aetna argues that coverage under its policy is triggered only by an "injury-in-fact." The injury-in-fact theory holds that the policy in force at the time the claimant suffers actual injury is the policy which must respond. ENVIRONMENTAL CLAIMS INSURANCE § 6.04[4] at 6-16. Aetna argues there was no actual injury in this case until VOCs reached the groundwater. It contends that there is a genuine issue of fact as to whether that occurred during its policy period.

ES&G and the city support the trial court's conclusion by citing *Wisconsin Elec. Power Co. v. California Union Ins. Co.*, 142 Wis. 2d 673, 419 N.W.2d 255 (Ct. App. 1987) (*WEPCO*). In *WEPCO* we held that there was a continuous period of exposure from the time a defective power supply was installed at a dairy farm until the emission of stray voltage was corrected. We said that a reasonable interpretation of the definition of "occurrence" was that "as long as there is harmful exposure to dangerous conditions, the occurrence is continuing." *Id.* at 681, 419 N.W.2d at 258. ES&G and the city contend that VOC contamination of the groundwater was a continuous process which began when the first solvents containing VOCs were disposed of in the landfill and continued as more and more solvents were disposed of and migrated through the sand, soil and rock. Because Aetna's policy was in effect during this continuous process, they argue that coverage was triggered as a matter of law.

*WEPCO* was a property damage case. "The trigger of coverage' issue may be resolved differently depending upon the type of injury or damage that was suffered by the underlying claimant." ENVIRONMENTAL CLAIMS INSURANCE § 6.01 at 6-4. It was easy to conclude in *WEPCO* that the emission of stray voltage was a "single injurious process." *WEPCO* 142 Wis. 2d at 681, 419 N.W.2d at 258. The stray voltage was emitted from the power supply from the time the supply was installed until the problem was corrected.

However, the continuous trigger theory does not lend itself as readily to potential personal injury liability resulting from toxic torts and environmental claims. Here, for example, it is necessary to ask whether an "invasion of the right of private occupancy" occurred when the groundwater was contaminated by percolating

553

pollutants, or when waste containing VOCs was first disposed of in the landfill. The parties have not cited us any case applying the continuous trigger of coverage theory to a personal injury liability case. So far as our research discloses, the questions which must be answered in this case have not been answered by the courts. We decline to determine the appropriate trigger of coverage in this case without sufficient briefing by the parties. We believe that that briefing may be possible after all the relevant evidence is admitted at trial.

Further, the evidence at trial may obviate the need to answer this difficult legal question. The factfinder may determine after hearing the evidence that contamination of the groundwater indisputably occurred during Aetna's policy period.

## VI. OWNED-PROPERTY EXCLUSION

General Casualty's policies do not apply to property damage to property owned or used by the insured. Aetna's policy contains a similar exclusion. The insurers argue that their policies do not provide coverage for the costs involved in cleaning up and remediating the landfill itself. We disagree.

The owned-property exclusion is "more of a clarification of general liability coverage than an exclusion." ENVIRONMENTAL CLAIMS INSURANCE § 3.08[1] at 3-107. We adopt the reasoning of those courts which have held that the owned-property exclusion does not apply where the concern is not primarily the premises of the insured, but rather the substantial harm, or risk of substantial harm, to third-party property, including natural resources belonging to the people of the state. See cases collected in the Annotation, *Liability Insurance Coverage For Violations of Antipollution Laws*, 87 A.L.R. 4th

554

444, §§ 27, 28[a] at 536-45 (1991 & Supp. 1992). *Intel*, 692 F. Supp. 1171 (discussed *supra*, Part II), is representative of those cases.

Intel entered into a consent decree with EPA to remediate the site at which it had stored toxic chemical solvents in an unsecured underground storage tank. Test results showed that the site was contaminated by hazardous waste solvents, both in the soil and in groundwater percolating beneath the soil.

Intel submitted to its insurer, Hartford Accident and Indem. Co., its claim for reimbursement for reasonable and necessary investigation and cleanup costs incurred by it in complying with the consent decree. Hartford denied coverage under its policy's owned, occupied or rented exclusion. The court concluded that the exclusion did not apply to Intel's response costs. The court emphasized that Intel's remediation efforts pursuant to the EPA-approved work plan were not taken "merely to restore [its] property." *Intel*, 692 F. Supp. at 1184.

As a PRP, Intel faced joint and several liability for the consequences of its contamination. The court noted that under the California Water Code, all water within the state is the property of the people of the state. *Id.* at 1183. The court considered that EPA's assessment of the danger presented by Intel's disposal site was tantamount to a finding of public nuisance. The court concluded that costs incurred by Intel to abate this public danger were not excluded by Hartford's owned, occupied or rented exclusion.

In *Fortier* we concluded that contamination of the groundwater may constitute a private nuisance. It may also constitute a public nuisance under Wisconsin law. The "waters of the state" include groundwater within

the state. Section 144.01(19), Stats. It is undisputed that the federal and state governments may exercise their police powers to abate a public nuisance. This is not a case where the insured is incurring costs primarily to repair its own property. The cleanup and remediation is intended to repair the environment. We conclude that repairs to the site itself, when made as an element of a comprehensive cleanup and remediation plan designed to repair the environment, are not excluded from coverage by an owned-property exclusion clause. *See also Township of Gloucester v. Maryland Casualty Co.*, 668 F. Supp. 394, 400 (D.N.J. 1987).

## VII. UNTIMELY NOTICE

We conclude that a genuine issue of material fact exists as to whether General Casualty and Aetna were prejudiced by the insureds' untimely notices that the groundwater beneath, and in the vicinity of, the landfill was contaminated by VOCs possibly leaching from the landfill. The existence of that issue precludes the grant of summary judgment to any party. *Grams v. Boss,* 97 Wis. 2d 332, 338-39, 294 N.W.2d 473, 477 (1980). We note at the outset that there is persuasive authority that the preferred arbiter to resolve the issue of prejudice resulting from untimely notice to an insurer is the trier of fact. In *Ehlers v. Colonial Penn Ins. Co.*, 81 Wis. 2d 64, 67-68, 259 N.W.2d 718, 721 (1977), the court said that when controverted, the question of whether an insurer was prejudiced by failure to give timely notice is a question of fact for the trier of fact. Lathrop states: "To the extent that a trend can be detected, it would seem that it is shifting toward treating late notice issues as issues of fact to be resolved by the trier of fact rather than pure issues of law." ENVIRONMENTAL CLAIMS INSURANCE § 8.02[1][b] at 8-15.

Clearly, summary judgment methodology does not effortlessly embrace the prejudice issue. It is difficult for a party to an untimely-notice dispute to demonstrate a right to judgment with such clarity as to leave no room for controversy. *Grams,* 97 Wis. 2d at 338, 294 N.W.2d at 477. General Casualty and Aetna rely principally on the failure of the insureds to give them notice of the groundwater contamination for five to six years. They argue that this failure entitles them to summary judgment as a matter of law. Although they cite decisions in which the Wisconsin Supreme Court has held that lengthy delays entitled the insurers to summary judgment, we conclude that the effect of failure to give timely notices is now governed by statute.

Section 632.26(2), Stats., which applies to liability policies provides: "Failure to give notice as required by the policy . . . does not bar liability under the policy if the insurer was not prejudiced by the failure, but the risk of nonpersuasion is upon the person claiming there was no prejudice." ES&G and the city argue that sec. 632.26(2) eliminates the rebuttable presumption that prejudice results from untimely notice, identified in *Gerrard Realty Corp. v. American States Ins. Co.,* 89 Wis. 2d 130, 146, 277 N.W.2d 863, 872 (1979). General Casualty asserts that the insureds' contention is in direct contradiction to sec. 631.81(1), Stats., which was construed in *Gerrard.* Section 631.81(1) provides that if the insured gives notice of loss as soon as reasonably practicable and within one year after the time it was required to be given under the policy, the claim is not invalidated unless the insurer shows prejudice. The *Gerrard* court said that where the claimant gave notice more than one year late, the burden of showing prejudice shifted to the claimant.

557

Section 631.81(1), Stats., like sec. 632.26(2), Stats., is "concerned with determining who wins when the totality of evidence is inconclusive . . .." Legislative Council Note, 1979, sec. 632.26(2), Stats. Sections 631.81(1) and 632.26(2) are not concerned with tipping the scales as to prejudice in favor of either insurer or insured.

Further, a burden-shifting statute is of little utility on summary judgment where the movant already has the burden of going forward and bears a considerable burden of persuasion. We conclude, therefore, that whether summary judgment may be granted on the issue of prejudice because of the insured's untimely notice is to be determined by well-settled summary judgment methodology. If we identify genuine issues of material fact, we must deny summary judgment, leaving for trial the application of any presumption and the risk of nonpersuasion.

We therefore examine the evidence to determine whether there is any genuine issue of fact as to whether General Casualty and Aetna were prejudiced by the insureds' untimely notice. General Casualty and Aetna argue that they were prejudiced by the loss of a valuable witness when the former owner of the landfill, Charles E. Sweeney, died in September 1989. General Casualty claims it has been prejudiced by failure of ES&G and the city to file timely claims with the liquidator of Iowa National because it lost the right of contribution from Iowa National. Finally, General Casualty contends that if it had known in 1984 of the groundwater contamination, it would not have continued to issue policies to ES&G and the city covering the landfill. Aetna argues that since 1984, ES&G may have allowed the contamination to intensify and spread, thus increasing the

558

cleanup and remediation cost. Aetna also argues that, because of the excessive delay in notice, the insurers have been deprived of the opportunity to investigate the circumstances surrounding the insureds' claims.

The trial court found that there was nothing in the record to indicate that the insurers would have done anything different in 1984 than they did in 1989; that is, deny coverage and refuse to defend. The court also found that it was undisputed that records concerning the landfill and many of the witnesses to its operation were available for inspection and investigation; studies on the impact of the landfill on VOC contamination of the groundwater and necessary remedial measures were available.

We note that the waste types landfilled have been identified and the quantity estimated. *See* FOTH AND VAN DYKE, WORK PLAN FOR LANDFILL CLOSURE AND GROUNDWATER REMEDIAL INVESTIGATION/FEASIBILITY STUDY 6-7 (July 11, 1991).[30] Collection of a consistent set of indicator parameters from the groundwater began in May 1977 and included pH, temperature, conductivity, chemical oxygen demand, total hardness, chloride, iron, and sulfate. *Id.* at 7. Testing for VOC concentration began in February 1984. *Id.* The results of groundwater testing are reported in the February 1989 report by Warzyn Engineering, Inc. *Id.*

The landfill has been subject to DNR's licensing and regulatory authority since 1971. In a meeting between ES&G and DNR on February 15, 1984, the industries and major haulers who disposed of waste at

---

[30] We recognize that the Work Plan was not completed when the circuit court rendered its decision. We cite the Work Plan solely to show that information as to the landfill and the groundwater is available to permit the insurers to participate intelligently in the investigation and remediation process.

the landfill were identified. ES&G has retained Warzyn Engineering since 1976 to advise it as to the design and operation of the landfill and to monitor groundwater quality. EPA made a Superfund inspection of the site in June 1984. In view of the considerable information available, the trier of fact could conclude that General Casualty and Aetna have not been prejudiced by the passage of time since VOCs were first detected in the groundwater, or by the death in 1989 of the former owner and operator of the landfill, Charles E. Sweeney.

The prejudice resulting from the insureds' failure to file a timely claim in the Iowa National liquidation is, at this time, problematic. Apparently, the liquidation is not completed. General Casualty suffered no prejudice from its issuance of policies after 1984 because ES&G and the city do not claim coverage under such policies.

While each party's proof is sufficient to make a *prima facie* case for summary judgment, the countervailing evidence establishes that there exist disputed material facts which entitle the opposing parties to a trial of the prejudice issue.

### VIII. "DROP DOWN" AND "KNOWN LOSS" ISSUES

#### A. *"Drop Down" Issue.*

ES&G and the city do not argue that Aetna's policy "drops down" to provide primary coverage because of Iowa National's insolvency. They argue, however, that they have paid sums exceeding Iowa National's underlying policy or retained limit and therefore Aetna's duty to defend has been triggered. We conclude that on the record before us, we cannot determine whether, or when,

ES&G and the city have become obligated to pay sums exceeding Iowa National's underlying policy limit. That issue shall be decided on remand.

### B. *"Known Loss" Issue.*

It is fundamental that an insurer does not insure a loss which has already occurred. *Estate of Logan v. Northwestern Nat'l Casualty Co.*, 144 Wis. 2d 318, 348, 424 N.W.2d 179, 190 (1988). General Casualty argues that there is a genuine issue of material fact whether ES&G and the city knew, or should have known, that the groundwater was already contaminated by VOCs when they applied to it for liability coverage of the landfill. We need not consider this issue because we have already concluded that there is a genuine issue of fact that precluded summary judgment in favor of ES&G and the city. *See State v. Better Brite Plating, Inc.*, 160 Wis. 2d 809, 813, 466 N.W.2d 239, 243 (Ct. App. 1991), *modified*, 168 Wis. 2d 363, 483 N.W.2d 574 (1992) (summary judgment not appropriate to define and limit issues for trial).

### CONCLUSION

We affirm the trial court's denial of the insurers' cross-motions for summary judgment and reverse its grant of summary judgment to ES&G and the city. In so holding, we find that the Superfund initiative constitutes the functional equivalent of a "suit" and expenditures for cleanup and remediation costs constitute "damages" under the terms of the insurers' policies; personal injury liability coverage provisions include injury to the groundwater, which is not excluded by the "expected" or "intended" provisions of the policies; and the owned-property exclusions do not preclude coverage for

remediation of the insured's property where the purpose of such work is to stop or prevent environmental damage. We also find that a trial is necessary to decide factual issues as to the appropriate trigger of coverage; the "known loss" and "drop down" claims; and prejudice resulting from untimely notice to the insurers.

*By the Court.*—Judgment affirmed in part, reversed in part and cause remanded.